UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANNA AROCHO & YOLANDA AROCHO[1] | ) | |
| CARMEN LOZADA-TORRES, | ) | |
| JESSENIA MARTINEZ, CANDIDA | ) | |
| LARACUENTE, FELICITA FIGUEROA, | ) | |
| and JECKSON RODRIGUEZ LARACUENTE | ) | |
| and JOHN and/or JANE DOE(S) | ) | |
|     Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. No. 3:24-CV-30123 |
| | ) | |
| CHICOPEE HOUSING AUTHORITY | ) | |
| and MONICA BLAZIC | ) | |
| and PAUL and/or PAULINE POE(S) | ) | |
|     Defendants | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
*(With Incorporated Memorandum of Law)*

Domingo Arocho was stabbed to death at the Chicopee Housing Authority's Governor

George D. Robinson Apartments ("GGDRA"). His killer was a fellow tenant, with an irreparable

history, who had killed before, said he would kill at GGDRA, and then did just that. Plaintiffs are

Mr. Arocho's daughters, and witnesses to the murder. On August 23, 2024, Plaintiffs filed suit

against the Chicopee Housing Authority ("CHA") and its Executive Director, Monica Blazic.

"Helter-Skelter housing" has been the phrase used by media to describe the Blazic reign of terror

– a regime which condemned our society's most vulnerable to subhuman standards of treatment,

for years. In extraordinarily negligent fashion, Defendants breached contractual lease and

internal policy requirements, breached the implied warranty of habitability, the covenant of quiet

enjoyment, and violated constitutional rights of others, as it relates to one Urayoann Urimagua-

---

[1] Individually and as to-be-named Personal Representatives of the Estate of Domingo Arocho.

Guraboa.[2] The quarter-decade reign will soon end. In its wake is the wrongful death of Mr.
Arocho, perpetual damage to those witnessed his violent death, and numerous other victims of
contempt for established housing practices, falling below the standards of human decency.
Discrimination comes in many forms. Plaintiffs have their own story of it – yet another branch
on the tree of indifference nurtured, in theory and in practice, by the Blazic regime.

## I. Standard of Review

A court may grant a motion to dismiss only if the complaint lacks enough facts to state a
claim to relief that is plausible on its face. 12(b)(6) is meant to test the sufficiency of the
complaint, not decide the merits. To survive, a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on its face.[3] A court may not disregard
properly pled factual allegations even if "actual proof of those facts is improbable." Ocasio-
Hernandez, 640 F.3d at 12 (quoting Twombly, 550 U.S. at 556). Rather, the inquiry focuses on
the reasonableness of the inference of liability that the plaintiff is asking the court to draw. The
assessment is holistic: the complaint should be read as a whole, not parsed piece by piece to
determine whether each allegation, in isolation, is plausible. Hernandez-Cuevas v. Taylor, 723
F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernandez, 640 F.3d at 14).

## II. The Plaintiffs Have Standing

Plaintiffs have suffered unimaginable "actual" "injury-in-fact." The origins of these
harms are the regime's invidious disdain for Hispanics, the elderly, the handicapped, and
generally, the vulnerable low-income individuals whom they exist to serve. Defendants evidently

---

[2] The killer has used several names/alias' – Urayoan Urimagua Waraboa fka Samuel Diaz aka Samuel Diaz Ortiz aka
Samuel Diaz Sr.

[3] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
Determining plausibility requires the reviewing court to draw on its experience and common sense. Harris v. Mills,
572 F.3d 66, 72 (2d Cir. 2009). The Second Circuit has interpreted Bell Atlantic to require "a flexible 'plausibility
standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such
amplification is needed to render the claim plausible." Igbal v. Hasty, 490 U.S. 143, 157-58 (2d Cir. 2007).

equate this scenario to that involving a social organizer who challenged the constitutionality of a parade ordinance, regarding fees it imposed to participate, and police involvement.[4] Next, to a case involving dairy farmers who sought injunctive relief from a Commonwealth-invoked milk pricing edict. The farmers were found to have standing, and the district court's dismissal of their complaint for lack of standing was reversed and remanded.[5] Thirdly, Lujan, where the Court held plaintiffs who claimed only a generalized future intention to study animals abroad, rather than definite plans, could not show "concrete or imminent" harm.[6] Lastly, Furtick v. Medford Housing Authority, 963 F. Supp. 64, 70 (D. Mass. 1997). Aside from involving a housing authority, the comparisons end there. Furtick claimed he and his family were aggrieved by a residency "ranking" system used to prioritize applicants for vouchers. Defendants identify the holding in Furtick but omit the facts. Furtick already received a "portable" housing voucher and had been living in public housing via that voucher, for months, prior to even commencing suit. Furtick could not enunciate a harm. He claimed only the "possibility" that he might again be subject to the same residency ranking system. There was nothing still impacting Furtick in any way that the Court could redress through the relief sought there.[7] Plaintiffs are not seeking

---

[4] The organizer was found to have standing. Furthermore, the parade ordinance was struck down, as unconstitutional.

[5] The Supreme Court made it clear as early as 1973 that a plaintiff's asserted injury-in-fact can extend, even, to aesthetic, conservational, and recreational forms – not merely economic or personal injury. This followed the long established principle quoted by Justice Stewart in United States v. S.C.R.A.P., 412 U.S. 93 S. Ct. 2405, 37 L. Ed 2d (1973) ("The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies its motivation").

[6] Plaintiffs' issue in Lujan dealt was with government regulations of a third party Justices Kennedy and Souter wrote that the "nexus theory" the plaintiffs in Lujan used to support their position as to standing "does not mean it would always fail." Justice Stevens concurred, but only because the law was not intended to apply to government agencies acting in foreign countries, otherwise that the plaintiffs had because any action harming wildlife also causes harm to someone who is trying to study it. Two others stated a reasonable jury could find harm, and that standing to sue should be broadly granted based on the intent of Congress.

[7] However, the Court found Furtick had pled another injury-in-fact, which they said may have formed the basis for standing. Namely, under the Administrative Procedure Act, providing that "[a] person suffering a legal wrong

declaratory and injunctive relief. The September 10, 2021 murder shall ceaselessly impact Plaintiffs. There has been no redress. This Court has the power to provide that remedy. Regarding the test discussed in <u>Furtick</u>, Defendants omit the decision's explicit instruction that the "second factor…is of primary importance." That is, whether there is any indication of legislative intent to create or deny the remedy sought. <u>Furtick</u> made a claim for monetary damages under entirely different sections of the housing act, than those under which Plaintiffs claim.[8] Defendants claim Plaintiffs assert "only that they lived in the vicinity of a dangerous person who did not personally harm them."[9] As to the contention the brutal murder did not "personally harm" Plaintiffs, the violent loss of life that occurred at GGDRA on September 10, 2021 demonstrably thwarts such an insulting suggestion.[10] Defendants further deny a nexus between Defendants' indifference for established policy, and any protected interest of the Plaintiffs. They are very careful, however, throughout, only to *hypothetically* claim they followed established policy, as it regards Urimagua.[11] They evade this issue because if they *did* implement

---

[8] Specifically, <u>Furtick</u> claimed under sections 1437, 1441 and 1441a. None of these creates a right to be enforced against a local authority. In fact, when the Court in <u>Furtick</u> held no standing could be found because "broad declarations of housing policy" do not convey a private right of action for money damages, they could quite literally point to the very *title* of the section <u>Furtick</u> sought relief under, 42 U.S.C. 1437. The title of 1437 is "**Declaration of policy**… 42 U.S.C. 3601-3619, however, and specifically 42 U.S.C. 3613, *expressly* conveys such a private right. <u>42 U.S.C. Section 3613</u> is entitled: "***Enforcement by private persons***". On Page 7 of their Motion, Defendants in fact acknowledge that the FHA provides a private right of action, wherein they state, "A cause of action against CHA pursuant to 42 U.S.C. §1983, **rather than solely pursuant to FHA's private right of action…**" [emphasis added].

[9] As outlined in the "Parties" section of Plaintiffs' Complaint, four of the seven Plaintiffs did not live at GGDRA or nearby. Mr. Arocho resided at GGDRA, as did Plaintiff Candida Laracuente, who lived next to the murderer. Plaintiff Jeckson Rodriguez Laracuente, a lawful guest and relative of Candida, witnessed Mr. Arocho's murder. Plaintiff Felicita Figueroa, a tenant at CHA's "Memorial Apartments" located 10 minutes from GGDRA, was a lawful visitor at the time of the murder. Aside from Mr. Arocho and Candida Laracuente, no Plaintiff has claimed they lived near a dangerous person or based their claims on such allegations.

[10] Mr. Arocho was stabbed thirteen times in the heart, chest and neck.

[11] Defendants' 30+ page Motion does not allege compliance with required policies concerning Urimagua, whether during his initial housing application or subsequent incidents. Federal regulations, incorporated into CHA's

established policy, Urimagua did not qualify for public housing. Similarly, he was required to be disqualified, post-acquisition. The Fair Housing Act explicitly does not require a plaintiff to be a member of a protected class to have standing. Instead, it provides "[a]n aggrieved person may commence a civil action in an appropriate U.S. District Court." 42 U.S.C. Section 3613(a)(1)(A). The statute defines an "aggrieved person" as "any person who – (1) claims to have been injured by a discriminatory housing practice…" As it gives standing to "aggrieved persons," it does not require a plaintiff to be a member of a protected class to have standing.[12] Nevertheless, Plaintiffs *are* members of a protected class, or classes,[13] among those the DOJ matter revealed, involving low-income Hispanic people, living in public housing. In Fernandez v. Orlando Hous. Auth., No. 6:15-cv-1341-Orl-40DAB (M.D. Fla. May 13, 2016), Stephanie Fernandez brought a lawsuit on behalf of herself, and as personal representative of the estate of her deceased father, Samuel Rosario. She alleged violations of the Fair Housing Act. Mr. Rosario was a tenant of Orlando Section 8 public housing. He was transferred to a third-floor apartment, and later, determined legally blind. Stephanie requested the authority move him to a 1st floor unit, and that he be allowed to have a live-in aide. Mr. Rosario subsequently fell in the apartment, resulting in a head

---

"Admissions and Continued Occupancy Policy," establish mandatory duties public housing authorities "shall" follow. For example, 24 CFR § 960.202 precludes admitting applicants likely to harm other residents. § 960.203 emphasizes the importance of screening tenant behavior and suitability, specifically disqualifying those with a history of violent or harmful criminal activity. CHA's policy further specifies that applicants must have no criminal history within three years that could adversely affect tenant safety and precludes admission for five years following an arrest or conviction indicating a threat to residents. It also reserves continued occupancy for tenants without criminal activity affecting others' safety. Massachusetts law imposes even stricter requirements, mandating disqualification for certain behaviors under M.G.L. Chapter 121B § 32.

[12] See Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 103 (1979).

[13] All Plaintiffs are Hispanic, members of a racial minority. Mr. Arocho, Ms. Laracuente, and Ms. Figueroa were elderly. Ms. Blazic openly displayed hostility toward Hispanics, forbidding the language in her presence and workplace and expressing disdain for dealing with them. CHA, already in operational disarray, failed to enforce its policies during Urimagua's application process, leading directly to the murder. Despite Urimagua assaulting another Hispanic tenant, CHA transferred him next to Ms. Laracuente. Defendants suggest CHA could not deny him housing because he was Hispanic, but this excuse fails to justify CHA's policy violations. That Urimagua was also Hispanic underscores CHA's disregard for the safety of Hispanic tenants, even when threatened by fellow Hispanic residents.

injury. He was admitted to the hospital and upon his release, returned there. The day after, he was found dead. An autopsy revealed he hit his head due to seizure, or fainting. OHA moved to dismiss, alleging Stephanie, "personally", was not a victim of discrimination in exercising or enjoying her own protected housing rights.[14] She claimed mental injury. The Court noted an award of actual or punitive damages would remedy this, concluding Stephanie met the requirements of constitutional standing, and affirmatively stated FHA claims "in her individual capacity." See also <u>Moua v. City of Chico</u>, 324 F.Supp.2d 1132 (E.D. Cal. 2004), holding visitors of a municipal housing authority deterred from visiting the Mouas because of violence occurring at the housing affirmatively stated an "injury-in-fact."[15]

### III. <u>The Plaintiffs' Fair Housing Act Claims are Not Time-Barred</u>

Defendants' claim Plaintiffs' FHA claims are time-barred but cite only one of the two subsections of 42 U.S.C. 3613. (B) expressly provides that the computation of such 2-year period shall not include any time a discriminatory housing administrative proceeding is pending. The FHA implicitly includes a mechanism for involvement of state agencies in the investigation of complaints, tolling the statutory limitations period. After stating that "[a]n aggrieved person may … file a complaint with the Secretary [of HUD] alleging such discriminatory housing practice," the FHA enforcement provision goes on to provide (1) whenever a complaint alleges a

---

[14] But she did assist in the exercise and enjoyment of her father's rights, and as the Court stated, it is "well-established" that a plaintiff need not be the individual whose rights under the FHA were violated, to state a claim. So long as the plaintiff suffers actual injury as a result of the defendant's conduct, she [Stephanie, and Plaintiffs] are permitted to prove that the rights of another were infringed.

[15] Specifically, the Court said, "[u]nder the Act, any person harmed by discrimination, whether or not the target of the discrimination, can sue to recover for his or her own injury. This is true, for example, even where no housing has actually been denied to persons protected under the Act." Further, that, "[t]hey have alleged an injury-in-fact – the deterrent effect that the municipal defendants' actions allegedly had on their willingness to visit the Mouas at their apartment – causation and redressability. These allegations suffice to establish Article III standing. See <i>Havens Realty Corp. v. Coleman</i>, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121 (1982) (an FHA plaintiff establishes standing by alleging merely that "as a result of the defendant's actions he has suffered a distinct and palpable injury").

discriminatory practice, (A) within the jurisdiction of a State of local public agency, and (B) as to which such agency has been certified by the Secretary, the Secretary shall "refer" such complaint, to such agency, before taking action. 42 U.S.C. § 3610(f). Dickinson v. Zanesville Metro Hous. Auth., 975 F. Supp. 2d 863, 869 (S.D. Ohio 2013) outlines the ordinary referral process. In Dickinson, it was undisputed that the pendency of the related administrative proceeding tolled the limitations period. Id. at 876.[16] Dickinson was followed in Lath v. Oak Brook Condo. Owners' Ass'n, No. 16-CV-463-LM, 2017 WL 3444774, at *1 (D.N.H. August 8, 2017).[17] The amended complaint filed by the DOJ in the related "proceeding" specifically states the proper process occurred, here. Paragraphs 35 – 39 of the DOJ's Amended Complaint.[18] As the Court is aware, the DOJ matter was not solely about Clover King. It was an ever-evolving exposure of a pattern of discrimination.[19] All victims have one thing in common – they are all

---

[16] See also, Allen v. Hous. Auth. Of Auburn, 638 F. App'x 825 (11th Cir. 2015)(An administrative proceeding that meets § 3613(a)(1)(B)'s requirements will toll the running of the statute of limitations during the proceeding's pendency).

[17] Unlike here, Lath failed to show the agency proceeding was a "referral" from the Secretary of HUD or that the "statutory referral process, as described in Dickinson," occurred. Lath did not even cite 42 U.S.C. § 3613(a)(1)(B). Defendants reference the Court's summary judgment decision in August 2017 addressing the statute of limitations, but earlier, in March 2017, Lath survived a motion to dismiss after amending his complaint. The Court allowed Lath to pursue claims under 42 U.S.C. § 3604(b) and § 3604(c), as well as civil conspiracy claims, based on hostile housing environment allegations tied to his sexual orientation, race, and national origin. See Lath v. Oak Brook Condominium Owners' Association, 2017 DNH (D.N.H. 2017).

[18] ...the Secretary authorized the United States Attorney General to commence a civil action...Following issuance of the Letter of Findings and Formal Determination of noncompliance, HUD sought CHA's voluntary compliance and resolution of the outstanding violations...Efforts at resolution were unsuccessful. On August 16, 2021, HUD referred this matter to DOJ for enforcement..."

[19] HUD and the Department of Justice exposed years of distressing, widespread discrimination against certain races and/or statuses. Not one form of discrimination, but a cultural indifference toward Hispanics, in particular, which had various applications. Ultimately, HUD issued a letter of findings, as well as a formal determination of noncompliance regarding numerous forms of discrimination. Their efforts to seek CHA and Ms. Blazic's voluntary compliance with those findings through the normal administrative channels were "unsuccessful." Therefore, the matter was "referred" to the DOJ, to be enforced. See United States v. Chicopee Housing Authority and Monica Blazic, No. 21-CV-10649-KAR. See specifically, United States' Amended Complaint, Factual Allegations, No. 38 and 39. The Amended Complaint devotes an entirely separate subsection to "*Race and National Origin Discrimination*", containing numerous *specific* examples of the subhuman beliefs held by the individual steering the ship, over the course of *years*. These are specifically referred to as only a "part" of a longstanding pattern.

low-income minorities, resigned to public housing. The DOJ "proceeding" remained "pending"

with this Court until **October 11, 2024**, tolling the limitations period. On October 11, 2024,

Defendants settled that proceeding, voluntarily.[20] Thus, they say the pattern is "unproven". At

minimum, the Consent Order reinforces the existence of a "longstanding pattern and practice of

illegal discrimination based on race and national origin." By any reading, HUD and the DOJ

uncovered discriminatory mayhem in public housing. That Defendants made the wise choice to

settle on the heels of another suit, as opposed to having a jury decide their fate, does not

somehow absolve them. Plaintiffs' claims are part of the inter-woven fabric in pattern. At this

stage, the federal and state civil rights claims must not be dismissed as untimely. Discovery, at

Defendants' request, has not proceeded. The case has not been presented to a trier of fact. Fisher

v. City of Annapolis, Civil Action CCB-21-1074 (D. Md. Mar. 30, 2022). Plaintiffs have not

unreasonably pursued these claims. Defendants suffer no prejudice. Defendants allege Plaintiffs

have claimed only under §§ 3604(c) and 3617. The Plaintiffs do bring such claims, but also

sufficiently stated claims under § 3604(b).[21] § 3604(b) covers not only just initial rental of a

---

Defendants make no mention of that component of the DOJ matter, in its brief, limiting its comparison only to
Clover King and essentially arguing Plaintiffs here must also have experienced discrimination based upon disability
status, to proceed.

[20] The Defendants were also represented by Hassett & Donnelly, PC in the DOJ matter. Specifically, both Gerard
Donnelly, Esq. and Wendy Quinn, Esq. (among other members of the firm) filed appearances on behalf of the
Defendants in the DOJ matter, and both Atty. Donnelly and Atty. Quinn have filed an appearance for the Defendants,
in this matter. The settlement came within approx. 72 hours of the Plaintiffs' suit being removed to this Court.

[21] Paragraph 47 of Plaintiffs' Complaint reads, "The Fair Housing Act, 42 U.S.C...3601-3619, prohibits
discrimination in housing on the basis of race, color, national origin..." See also Paragraphs 48 through 50 of the
Complaint, wherein Plaintiffs plainly allege Defendants, through their actions and namely, through their
"omissions", had discriminated "against Hispanic[s]...by demonstrating a deliberate indifference to the safety and
well-being of these individuals..." Moreover, that CHA failed to comply with their own continued occupancy policy
by "permitting the Murderer, a *known* violent individual...to continue residing in CHA housing, despite clear
evidence of his threat to the basic right of safety tenants of the Premises were entitled to." Plaintiffs also plainly
allege that by allowing the murderer to remain in CHA housing, Defendants showed a "reckless disregard for the
lives and safety of the largely Hispanic community at the housing authority Premises, effectively condoning or
otherwise enabling his violent behavior and creating a hostile and dangerous environment." See also Paragraph 53.

dwelling, but also, "conduct that...would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling after acquisition." Francis v. Kings Park Manor, Inc., 944 F.3d 370, 377 (2d Cir. 2019). Harassment is a form of unlawful discrimination and includes hostile environment harassment. According to the Massachusetts Attorney General, hostile environment harassment is unwelcomed conduct that is sufficiently severe or pervasive to interfere with a person's ability to use and enjoy housing. Courts have found that a hostile housing environment claim under 3604(b) is cognizable.[22] A plaintiff must allege (1) they were subjected to harassment sufficiently pervasive and severe to create a hostile housing environment, (2) the harassment was due to their membership in a protected class, (3) defendant is responsible for the harassing conduct towards plaintiff. The AG expressly reminded housing providers that "it is unlawful for landlords or other housing providers to allow harassment or intimidation by one tenant against another tenant." In addition to Urimagua's alarming history prior to 2019, in 2019, he was accused of assaulting and threatening to kill his former neighbor, a Hispanic female, at a different CHA housing complex. For reasons presently unknown, he was subsequently transferred right next door to another Hispanic female, at GGDRA.[23] At GGDRA, police responded to at least two incidents which involved Urimagua threatening to kill again. Surely, this qualifies as severe or pervasive conduct.

---

[23] The April 12, 2019 Summary Process Agreement proscribed for a 6-month "grace-period", providing Urimagua was to have no communication with his neighbor, Maritza Ortiz, that activity would be monitored, and that if not brought forward by October 11, 2019, the case would be dismissed. A reliable address database indicates Urimagua continued living at that CHA housing complex (Edward J. Bury), but only another two months or so (until June 2019). Plaintiffs would like the opportunity through discovery to understand why he was transferred or ceased living at Edward J. Bury just 2 months into the 6 month "grace-period", and to further understand the circumstances surrounding his transfer next door to Ms. Laracuente, at GGDRA. In a statement she provided to responding officers, Ms. Ortiz reported that Urimagua attacked her with a cane for attempting to remove a green hose he had tied to her side of a shared balcony, and then grabbed her by her neck and told her he was going to kill her.

The HUD rule extends to a "third-party harasser".[24] In assessing a hostile housing environment claim, Courts stress the totality of circumstances must be considered, including the frequency of discriminatory conduct, its severity, whether it is physically threatening, humiliating, or an offensive utterance.[25] In Wetzel v. Glen St. Andrew Living Center, 901 F.3d 856 (7th Cir. 2018) a landlord was liable under the FHA when it had actual notice of tenant-on-tenant harassment based on a protected status.[26] § 3617 is otherwise broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the FHA. Interference under § 3617 is interpreted to include any neighbor harassment that would reduce a reasonable person's enjoyment of housing to the point they consider moving.[27] § 3617 extends to exercising any right protected by sections 3603-3606 of the Act, so long as the interfering, coercive or threatening conduct be at least "partially" motivated, by intentional discrimination. As discussed in Lath, no showing of subjective intent to discriminate is necessary to establish a violation of 3604(c). See also Jancik v. Dep't of Housing & Urban Devel., 44 F.3d 553, 556 (7th Cir. 1995). In Lath, the Court held even a newsletter could be construed as preferring owners with certain "true service

---

[24] "a housing provider…or property manager is liable under the Act for negligently failing to take corrective action against a third-party harasser when the provider or manager knew or should have known of the harassment and had the power to end it."

[25] In Honce v. Vigil, 1 F.3d 1085 (10th Cir. 1993), the Court of Appeals held a hostile environment claim is actionable under Section 3604(b) "when the offensive behavior unreasonably interferes with use and enjoyment of the premises" and is "sufficiently severe or pervasive to alter the conditions of the housing arrangement."

[26] The Court in Francis v. Kings Park Monir, Inc., 917 F.3d 109 (2d. Cir. 2019) later further interpreted: "We distill from the Rule, and from HUD's own reading of it, three elements that a plaintiff "must prove…to establish a housing provider's liability for third-party harassment: (1) [t]he third-party created a hostile environment for the plaintiff…; (2) the housing provider knew or should have known about the conduct creating the hostile environment;" and (3) notwithstanding its obligation under the FHA to do so, "the housing provider failed to take prompt action to correct and end the harassment while the power to do so." The Court in Francis went on to state the "aim" of the FHA is to "eliminate all traces of discrimination within the housing field." That the language of the FHA has a broad and inclusive compass, and courts therefore give it a generous construction. The Court in Francis also specifically held that § 3617 prohibited a landlord's "pre-Rule" failure to abate tenant-on-tenant discrimination, where the landlord knew of racially discriminatory conduct, and had the power to address it, but failed to do so.

[27] Ms. Laracuente fled GGDRA because of the murder and no longer is a Chicopee Housing Authority tenant.

dogs", to support a claim. Plaintiffs point to CHA's own policy, explicitly stating a "zero-tolerance" or "one-strike" rule, for violence or harassment. The rigidity of the policies was etched into written leases and applied to all public housing tenants. By consequence, their visitors also reasonably relied upon the environmental promises of safety and decency they promised to afford. Sadly, we are seeing clear evidence they were ignored, at least in Hispanic communities.[28] Pointedly, CHA and certainly Ms. Blazic did not *care* if a tenant in these communities was subjected to serious disturbances. After all, Blazic did not want them in "her housing" to begin with. CHA had various opportunities to avoid the heinous murder.[29] The broken promises of safe, decent housing were irreversibly broken, squarely creating liability under the FHA.

### IV. The Plaintiffs' Civil Rights Claims Under 42 U.S.C. § 1983 are Sufficiently Pled

The FHA claims are not time-barred.[30] Defendants claim there is authority that Congress precludes § 1983 enforcement of FHA rights. The Kris decision they discuss states at the outset, though, that no housing authority was even defendant at the time the pro se litigant's motion was decided.[31] Moreover, Defendants blatantly misrepresent the Court's findings. In one instance, removing the very first word of the Court's remarks as it regards preclusion of § 1983

---

[28] Ms. Blazic further prohibited Spanish being spoken in the housing authority office, unless a form she created, was completed.

[29] As noted in Wetzel, the FHA not only creates liability when a landlord intentionally discriminates against a tenant based on a protected characteristic, but also, when a landlord has actual notice of tenant-on-tenant harassment but chooses not to take any reasonable steps within its control to stop it

[30] The Plaintiffs does not venture to side-step anything. Even assuming this were true, such efforts would appear to be futile. An action pursuant to 42 U.S.C. § 1983 appears to be subject to the same two-year statute of limitations the Defendant allege Plaintiffs seek "escape" from, with their FHA claims. See Holden v. Boston Housing Authority, 400 F. Supp. 399 (D. Mass 1975).

[31] Nor was there any claim against a housing authority that they took any action, or failed to take any action.

enforcement of FHA rights ("Although") before cutting the heart of the statement off, entirely.[32]

Defendants also cite <u>S. Middlesex Opportunity Council, Inc. v. Town of Framingham</u>, No. 07-12018-DPW WL 4595369, at *16 (D. Mass. Sept. 30, 2008).[33] There, the Court merely stated its reluctance to apply substantive due process analysis and entertain equal protection challenges as it regards issues of local planning and development decisions,[34] which are not at issue here. Days after <u>S. Middlesex</u>, the Court in <u>Jackson v. Chicago Housing Authority</u>, No. 08 CV 278 (N.D. Ill Oct. 7, 2008) held Jackson's claim of housing discrimination could arise under the Fair Housing Act and the Civil Rights Act, stating "these claims are independent and concurrent, and § 1982 claims are neither enhanced, nor limited, by the FHA." Jackson, a disabled female minority, alleged the authority tried to intimidate her by moving a man who had previously sexually assaulted her, across the hall. The Court found this was directly related to her enjoyment of housing and prohibited on the basis "of any of the categories listed in § 3604." Further, that if

---

[32] After the word "here," the Court continued: "[although] there is no consensus on that issue, and there is no binding precedent in the First Circuit (Compare id. with <u>Owen v. City of Hemet</u>, No. ED CV 19-1388-ODW(E), 2020 WL 5093086, at *7, 2020 U.S. Dist. LEXIS 158738, at *15 (C.D. Cal. June 22, 2020) ("Given the similarities between the remedies provided under the FHA and those provided under the FHA and those provided under section 1983, it is not readily apparent that allowing Plaintiff to pursue an FHA claim through section 1983 would constitute an end run around the enforcement mechanism Congress provided in the FHA.")).

[33] While the Court held that the FHA enforcement mechanisms under §§ 3604 and 3617 foreclosed complementary relief under § 1983, this was not the basis for dismissing the § 1983 count. After resolving the issue of matching relief, the Court addressed the viability of constitutional claims, stating: "I now turn to whether the Plaintiffs have asserted constitutional claims enforceable through § 1983," and specifically analyzed <u>S. Middlesex</u>'s First Amendment, equal protection, and substantive due process claims. Defendants incorrectly suggest Plaintiffs' claims are not viable because duplicative recoveries are unavailable—something Plaintiffs never claimed. Defendants fail to explain why the Court would have addressed constitutional claims if duplicative recovery alone warranted dismissal.

[34] Defendants omit that the Court denied their summary judgment motion in <u>S. Middlesex Opportunity Council v. Town of Framingham</u>, 752 F. Supp. 2d 85 (D. Mass. 2010). The Court found no governmental immunity for discretionary functions where "Defendants used their positions of authority to manipulate the treatment of SMOC's permit applications." Immunity applies only if officials do not violate clearly established rights that a reasonable person would know. The Court found factual disputes over whether Defendants violated such rights, which were clearly established at the time. The Court also held Defendants had not shown that delaying a site plan and imposing procedural hurdles on SMOC was lawful. The Court emphasized the Supreme Court's guidance that "even in novel circumstances," the question is whether the law "gave fair warning that their alleged treatment" of the plaintiff was unlawful.

gender, race, or disabled status was such basis, it was be unlawful, under the Civil Rights Act. Jackson involved § 3604, and a civil rights cause of action.[35] Defendants alternatively claim Plaintiffs have not stated a viable cause of action pursuant to §1983, completely averting the allegations made in Paragraphs 57, 60, 61, 62, and 63, of the Complaint. Defendants claim Plaintiffs' due process claims can be "rejected at the outset" because the "decisions" at issue here were somehow "discretionary". Defendants also claim what happened at GGDRA on September 10, 2021, and their direct role in it, "shocks the conscience." In Washington v. Hous. Auth. of Columbia, 58 F.4th 170 (4th Cir. 2023), Danielle Washington sued the housing authority under § 1983, alleging it violated her father's Fourteenth Amendment right to bodily integrity. Mr. Witherspoon died of carbon monoxide poisoning from a faulty, outdated furnace. Despite legal requirements to inspect, test, maintain furnaces, and install CO2 detectors, the authority failed to act. The Court found deliberate indifference, citing "years of choices" that led to the tragedy. This behavior, which threatened numerous low-income families, shocked the conscience. Washington alleged sufficient early facts to show the authority recognized the risks, acted inappropriately, and that its policies were the "moving force" behind the constitutional injury.[36] The "grave facts" sufficiently supported the authority acted with deliberate indifference to Witherspoon's bodily integrity, violating his substantive-due-process rights. When people are placed in dangerous surroundings – when a defendant is deliberately indifferent to someone's health or safety – they violate the Constitution. See Cortes-Quinones v. Jimenez-Nettleship, 843 F.2d 556, 558 (1st Cir. 1988). In Fisher v. City of Annapolis, CCB-21-1074 (D. Md. Mar. 30,

---

[35] Notably, it appears in Jackson that the Court classified her civil rights claims to be under § 1982, rather than § 1983. Notwithstanding this, the involved deprivations of the Plaintiffs' civil rights here, under § 1983, should be treated no differently than what the Court viewed to be civil property rights at issue, in Jackson.

[36] In fact, the Court found any explanation to the contrary would permit a "one-free death" card.

2022), the Estate of Damin Fisher sued the housing authority (HACA) after Fisher died, alleging mold exacerbated his respiratory disease due to HACA's "non-inspection policy". The Estate brought FHA, § 1983, and other claims. HACA moved to dismiss all claims. For the § 1983 claim, the Estate had to show Fisher was treated differently from others similarly situated due to intentional discrimination.[37] Fisher pointed to private renters. The Court took judicial notice of intrinsically related litigation in White v. City of Annapolis, 439 F. Supp. 3d 522 (D. Md. 2020), in which several Annapolis public housing residents also sued HACA for discriminatory conduct. The Court said the sister-suit was a "helpful starting point" supporting "an inference of intentional discrimination."[38] Defendants suggest substantive due process may not be invoked to challenge "discretionary" decisions. As in S. Middlesex, Collins and Pagan, Clark, Licari, and Light concerned permitting or licensing determinations, involving state or local decision makers, and the holdings simply reflect a court's desire to stay out of business disputes that state and local agencies are better equipped to handle. Plaintiffs' claims against Defendants do not involve business, land permitting, or licensing. Further, Plaintiffs in no way "primarily" take issue with the 2019 summary process agreement. If *only* that were all. As the SJC has recognized, "public housing tenants 'represent some of the most needy and vulnerable segments of our population, including low-income families, children, the elderly, and the handicapped.' For these reasons, a

---

[37] Plaintiffs know of no similarly situated individuals at CHA's nine other housing complexes who experienced what they did on September 10, 2021, or before. This includes CHA's three complexes for low-income elderly and handicapped individuals and six general complexes for low-income residents. Plaintiffs also know of no private renters in Chicopee who had a murderer placed next door who later committed a murder. Discovery may reveal whether Candida Laracuente, Domingo Arocho, or Felicita Figueroa underwent screening for vouchers, while Urimagua did not.

[38] Fisher concluded the "historical background and disparate impact weigh in favor of a discriminatory motive…[and] As the case will proceed to discovery on the Fair Housing Act claim, this court will not dismiss the § 1983 claim at this time."

tenant's interest in their public housing tenancy 'is a protected interest...'"[39] To be sure, in Lowell Hous. Auth. v. Melendez, 449 Mass. 34 (Mass. 2007), the SJC highlighted this.[40] As the Court discussed in Lowell Hous. Auth., the federal and state fair housing laws not only fully empower but *require* eviction of tenants who engage in violent activity threatening "the health, safety, or right to peaceful enjoyment" of housing authority premises. The Court held removal of such a person "that is significantly inimical to an authority's obligation to provide a physically safe environment for its tenants" is in fact, "compelled".[41] Plaintiffs have more than a "sufficient" private interest. For Mr. Arocho and Ms. Laracuente, it was an *essential* interest, to safe, decent housing. Housing is a right which involves "the very livelihood of the eligible recipient". Numerous cases highlight the importance of due process in housing. For instance, in situations involving the denial or termination of public assistance benefits. See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). See also Ferguson v. Metropolitan Development & Housing Agency, 485 F. Supp. 517 (M.D. Tenn. 1980). See also Wojick v. Lynn

---

[39] Carter v. Lynn Hous. Auth., 880 N.E.2d 778, 787 (Mass. 2008) (quoting Lowell Hous. Auth. v. Melendez, 865 N.E.2d 741 (Mass. 2007), then quoting Spence v. Gormley, 439 N.E.2d 741 (Mass. 1982)). Judicial review of the termination or deprivation of federal housing benefits has *long* been framed as a claim for deprivation of a vested property interest without due process of law. See, e.g., Ferguson v. Metropolitan Dev. Hous. Agency, 485 F. Supp. 517, 521-524 (M.D. Tenn. 1980). See also Vandermark v. Housing Authy. Of York, 663 F.2d 436, 442 (3d Cir. 1981), citing Board of Regents v. Roth, 408 U.S. 564 (1972); Edgecomb v. Housing Authy. Of Vernon, 824 F. Supp. 312, 314-315 (D. Conn 1993).

[40] "[t]he primary concern of public housing authorities is the safety of their tenants...Tenants of public housing developments...represent some of the most needy and vulnerable segments of our population, including low-income families, children, the elderly, and the handicapped. It should not be their fate, to the extent manifestly possible, to live in fear of their neighbors."

[41] That the sole example of such failed indiscretion exemplified by the 2019 summary process agreement arose from conduct of Urimagua at a different CHA housing complex "not near Plaintiffs", is irrelevant. As the Court held in Lowell Hous. Auth., where the Defendant tenant had committed the crime of armed assault and attempted robbery just in the same *city* – about a mile from the housing authority – this was near enough, to threaten the health, safety and quiet enjoyment of the public housing residents.  In 2004, HUD published a clear directive on how a housing authority can determine if someone poses a direct threat. See specifically Pages 4 and 5 of the directives, as well as Example 2. *Joint Statement of the Department of Housing and Urban Development and the Department of Justice,* "Reasonable Accommodations under the Fair Housing Act" (May 17, 2004).

Housing Authority, 66 Mass. App. Ct. 103 (Mass. App. Ct. 2006).[42] CHA's policy requires all families admitted to be "individually" determined eligible, meeting "ALL" requirements, including no history of disturbing neighbors or conduct likely to harm residents or disrupt their peaceful enjoyment. The conduct is what matters – not whether a nolle prosequi was entered when a frightened female victim of Urimagua, *still living next to him*, was likely too scared to proceed with criminal charges. That Ms. Ortiz did not proceed certainly does not erase the conduct. A nolle prosequi is a decision made by a prosecutor, not Ms. Ortiz. CHA's policy mandates specific criteria and time frames for disqualifying applicants based on past crimes or conduct, requiring thorough screening. These policies exist to protect public housing residents. CHA claims a "primary" interest in housing qualified individuals, yet Urimagua was <u>not</u> qualified initially or after repeated incidents warranting revocation of his eligibility.[43] HUD made a formal determination, through an independent review, that there was a pattern of discrimination rampant at CHA. The federal housing department made the same finding, independently. The pattern ranged anywhere from denying minority handicapped people reasonable accommodations, to omitting trash pick-up on a Hispanic street but picking it up the street over (which was predominantly white) to deeply invidious statements and beliefs about minorities, and here, to inexcusable disregard for long-established requirements which exist to

---

[42] <u>Wojick</u> challenged the authority's termination of her subsidy benefits after she made a verbal threat during a phone call with the authority. The authority's housing officer determined this should not result in termination of Wojick's benefits, after hearing from Wojick credible evidence explaining the outburst, including emotional stress she was under, and a genuine apology. However, the authority disregarded the hearing officer's decision – a decision he had discretion to make, and one the housing authority did <u>not</u> have discretion, to reject. The Court explained only "in those cases where the family is to be deprived of an entitlement does due process become important."

[43] Even if any discretionary room could be found, the discretion exercised by CHA was an abuse of discretion. <u>Commonwealth v. Fredette</u>, 56 Mass. App. Ct. 253, 259 n. 10 (2002) ("[f]ailure to exercise discretion is itself an abuse of discretion"). Further, an authority "does not act at its peril and put the plaintiff's due process rights in jeopardy" just by exercising – even erroneously – its own authority under the same regulations that give the plaintiff her due process rights. <u>Wojick</u>. See also 24 C.F.R. § 982.555 (1995).

protect the most vulnerable. Ms. Laracuente was never so much as verbally notified who would be moving in next door to her.

### V. **Plaintiffs have stated the prima facie elements of a Civil Rights Conspiracy**

Distortive beliefs arise when there is an over-perception, grouping, or patterns of treatment, as it applies to a certain race, or income status. World history has demonstrated the most severe cases. Here, Defendants discuss Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988).[44] When a plaintiff claims a fourteenth amendment violation, the violation is per se unlawful unless the government can rely on "specifically established and well-delineated exceptions" to justify the deprivation. This is the government's burden in civil proceedings. See New Bedford Housing Authority v. Olan, 50 Mass. App. Ct. 188 (Mass. App. Ct. 2000). While Plaintiffs can point to a plethora of readily available information concerning Urimagua, CHA can point to none that would come close to justifying the circumstances they directly and originally created, at GGDRA. The term "pattern" is often used in art. Widespread discrimination comes in a variety of shapes and sizes. This Count must survive at this early stage to determine how large this mural is.[45]

---

[44] There, the Court noted that a total of two incidents together with "all remaining evidence" was sufficient to permit a reasonable jury to find a civil rights conspiracy "without speculation and conjecture." In fact, they noted that if the jury had resolved the underlying civil rights claims (that officers conducted an illegal search and arrest and stop and search) it could indeed have constituted an actual deprivation of rights "secured by the Constitution and laws." They noted it would not have been necessary to show an express agreement, to prove a conspiracy – that it can be established by "sufficient circumstantial evidence" allowing a jury to "infer" a conspiracy.[44] Thus, Earle simply highlighted how the Court rules when there is no "actual deprivation of a right secured by the Constitution and laws" (i.e. where the jury found there was no illegal search and arrest nor illegal stop and search, of Earle).

[45] While not mentioned by Defendants as an element, to prove civil conspiracy, a plaintiff must also show that there was some "peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in a like relation to the plaintiff would not have had." See Wodinsky v. Kettenbach, 22 N.E.3d 960, 86 Mass. App. Ct. 825 (2015). Here, Defendants had a *distinctive* power over the individuals they served, who were fully reliant upon CHA for the basic need of housing, as low-income persons with Section 8 vouchers. Put differently, they had nowhere to go. Whereas persons not amongst the most vulnerable members of our society would not think twice about moving away from Urimagua at the first inkling of how dangerous he was, that was not a realistic option for Mr. Arocho, or Ms. Laracuente, and by consequence, those who wanted to visit them, who had to go to GGDRA, to do so.

## VI. Massachusetts Civil Rights Act (MCRA)

The MCRA protects all residents and visitors of Massachusetts against threats and interference with civil rights. The Attorney General publishes an "FAQ" stating the MCRA protects the basic right to live peacefully in your home, free from threats, intimidation, coercion, and violence. That this is "the heart of our safety, well-being and freedom." Defendants allege a public housing authority is excluded from the statute because of 11H's use of the word "person".[46] Yet, in the same breath, Defendants cite Valentin v. Town of Natick, where the Court found plaintiffs had "plausibly alleged the Defendants interfered with their rights", with no mention of the Town being excluded. In Wodinsky, the Court noted that whether conduct constitutes coercion is examined from an "objective, reasonable person standard." To suggest the CHA, and Blazic (who *is* a "person") are not subject to the statute is, plainly, wrong. For the reasons enunciated above, Plaintiffs retain viable claims under the MCRA. The "coercion" prong is construed more broadly by Courts, indicating that element may "rely on physical, moral, or economic coercion."[47] Plaintiffs were at the mercy of CHA, for vouchers, for housing, for safety. Their vulnerability, however, does not render them without federal and state constitutional rights, and the housing authority's existence as such does not absolve them from liability under the MCRA.

## VII.     Massachusetts Fair Housing Law

In 1989, an amendment to M.G.L. c. 151B § 4(10) made it unlawful for a landlord to

---

[46] The Defendants appear to be referring to the Court's holding in Howcroft v. City of Peabody, 51 Mass. App. Ct. 573 (Mass. App. Ct. 2001), where the Court held that a *municipality* is not a "person" covered by the Massachusetts Civil Rights Act (MCRA)." The City of Chicopee is not a Defendant in this matter.

[47] See e.g., Kennie v. Nat. Res. Dept. of Dennis, 451 Mass. 754 (2008); Hafler v. Zotos, 446 Mass. 469, 505 (2006). In Wodinsky, the Appeals Court found "ample evidence overlooked by" the Defendants which supported an MCRA finding against them.

discriminate against a subsidy recipient either "because the individual is such a recipient," *or* "because of any requirement of such public assistance, rental assistance, or housing subsidy program." See DiLiddo v. Oxford St. Realty, Inc., 450 Mass. 66, 78 (2007). DiLiddo made it clear that it is the statute itself, not the defendants' conception of what should or should not constitute discrimination, that delineates what is "legitimate" and "nondiscriminatory". The statute does not require a showing of "animus." DiLiddo declined to carve out an exception to a mandatory section 8 program because a landlord claimed it caused him or the property owner substantial economic deficit if he complied.[48] Defendants also cite Burbank Apartments Tenant Ass'n v. Kargman, 474 Mass. 107, 117-18 (2016), discussing disparate impact. Burbank came after the Court's decision in Texas Dep't of Hous. & Community Affairs v. The Inclusive Communities Project, Inc., 576 U.S. 519, 542 (2015).[49] Broadly, the elements are (1) a practice that has (2) a discriminatory effect. There are two kinds. The first is referred to as traditional disparate impact – a greater adverse impact on one protected group than on others. In Jackson v.

---

[48] Unpersuaded this averted the 151B claim, the DiLiddo Court found the Superior Court judge who entered summary judgment in favor of defendants as to the violation of 151B § 4(10) had erred, where the lease provision at issue was a "requirement" for purposes of 4(10), and of the voucher program, and where the plain language of the statute and provision did not provide an exception that would allow rejection of a participant due to perceived financial harm. The same analysis can be applied, here. CHA was required by their own gospel to screen applicants and to review their eligibility for continued occupancy. It could not skip those requirements in the case of Hispanic communities *or* in evaluating Hispanic residents applying, which is exactly what occurred. Nor they could take an applicant's word as to their criminal or other exclusionary conduct. Unlike DiLiddo, CHA cannot point to a financial strain. Any duty DiLiddo claimed to have to the owner of the building "was superseded by their duty to comply with the law." As the Court recognized in Burbank, 4(10) has the goal of providing "affordable, decent housing for those of low income." Attorney General v. Brown, 400 Mass. 826, 830, 511 N.E.2d 1103 (1987). Applied here, GGDRA was not expected to be free of all crime, but it was *required* to be "decent". By no review can the conduct on the part of CHA, Ms. Blazic, and others, leading up to Mr. Arocho's slaying, or the GGDRA environment with him in it, be considered "decent". Indeed, this is the core of the Plaintiffs' claims.

[49] Inclusive Communities, a decision authored by Justice Kennedy, held that disparate impact claims are cognizable under the Fair Housing Act. J. Kennedy recognized that disparate-impact liability under the FHA, as here, also plays a role in uncovering discriminatory intent. It permits plaintiffs to uncover not just intentional bigotry, but unjustified practices that disproportionately exclude or harm people based on race, ethnicity, or other characteristics. Disparate impact discrimination includes actions by either private or governmental bodies that create a discriminatory effect upon a protected class or which perpetuate housing segregation without any concomitant legitimate reason.

Tryon Park Apartments, 6:18-CV-06238 EAW (W.D.N.Y. Jan. 25, 2019) the Court held an

African American, by alleging defendants' policy of rejecting rental applicants based on criminal

history, had stated a viable disparate impact claim. Mr. Jackson relied on empirical evidence[50] to

claim that nationally, and in New York, blanket bans on eligibility based on criminal history

resulted in the denial of housing opportunities at a disproportionate rate for minorities. Three

months later, in Hall v. Philadelphia Housing Authority, Civil Action No. 17-5753 (E.D. Pa. Apr.

5, 2019), the Court noted that "Nothing in the record suggests that a ban on residents with

convictions for homicide-related offenses disparately impacts disabled persons".[51] Taking the

holdings of Jackson and Hall together, two things are clear. First, denial of housing for an

applicant with a history of any felony crime created a valid disparate impact claim under the

FHA, and dismissal was not proper. Next, an authority's denial of housing for a homicide-related

offense, as one should hope, did *not* result in a disparate impact claim. In between the two poles,

is this case. CHA blatantly ignored established required policies which, if followed, left zero

room for discretion as to Urimagua's in-eligibility, for housing.[52] Urimagua's condoned behavior

once accepted into CHA significantly impacted a certain race – not at one CHA public housing

---

[50] Evidence which is based on observation or experience, or capable of being verified or disproven, by observation or experiment.

[51] The Court referred to the "touchstone" of substantive due process being 'the protection of the individual against arbitrary action of government" holding, "no factfinder would determine that the PHA's conduct was anywhere near conscience-shocking. The PHA's policy not to provide housing to individuals convicted of homicide-related offenses manifests "an effort to prevent future drug-related and other criminal activity, as well as other patterns of behavior that pose a threat to the health, safety or right to peaceful enjoyment of the premises by other residents[.]"

[52] It is not even clear CHA knew the true identity of Urimagua, when they approved him. Just the *known* history of extreme violence (including attenuated murder), information as to incidents when he was a Springfield Housing Authority tenant, etc., set forth in the factual allegations of Plaintiffs' Complaint (Par. 26-29) would have, and should have, warranted his disqualification, by CHA's own *required* established policy. Importantly, that is just the information which was obtained through simple internet searches or via public records, by counsel for Plaintiffs. Plaintiffs fully anticipate the criminal history of Urimagua and the omissions in CHA's screening of him will be expounded upon in discovery.

property, but two. CHA originally caused this problem and caused it to persist. Urimagua's

presence caused a known, actual and predictable disparate impact on low-income housing

residents (Mr. Arocho, and Ms. Laracuente, particularly), and by association, their guests.[53]

A systematic pattern of activity, even targeting one plaintiff, can compel the Court to find

allegations more akin to the serial misconduct cases, than implicating the single incident rule.

See Doe v. City of Northampton, Civil Action 23-10358-MGM (D. Mass. Jul. 1, 2024). In Doe,

the nature of the allegations was analogous to an ongoing and systemic pattern of misconduct

indicative of a constitutional violation. Here, the Court is asked whether CHA's monumental

failures with respect to common-sense *required* policies, resulted in a disparate impact on a

group of persons with a protected characteristic.[54] There are seven (7) people, just here – all of

whom low-income, Hispanics. All of whom, treated differently. No reasonable person –white,

black, green, Hispanic, disabled, elderly, non-disabled, private renter, or public housing tenant –

deserves to live amongst a known killer. Here, the killer was *placed* in the housing, *by* CHA.[55]

Plaintiffs are not required to show that they were treated differently from white tenants (while

very likely) as Defendants oddly suggest. There can be no speculation CHA had actual or

---

[53] But also, Maritza Ortiz, whom Urimagua assaulted in 2019. But also, the numerous victims identified in what is known from the DOJ matter, currently. And also, victims of discrimination who *continue* to come forward about the Blazic regime.

[54] In regard to the "robust causality" requirement, the Court has concluded that where a plaintiff's claim is not based purely on disparate impact, and specifically, where it is supplemented by allegations that the defendant's failure to comply with housing laws constituted intentional discrimination, and that the defendant knew its failure would have a disparate impact on people of color, just as "[e]vidence of discriminatory intent can bolster a disparate impact case" (Avenue 6E Investments, LLC v. City of Yuma (D. Ariz. 2017) 216 F. Supp. 3d 1040, 1055), allegations of discriminatory intent can bolster allegations that a disparate impact was caused by the challenged practice.

[55] Nevertheless, whether any certain number or percentage of protected individuals is affected is not the sole focus of a disparate impact claim. As the name suggests, the focus of such claim is on whether the complained of policy has an effect that falls more harshly on a protected class. Treece v. Perrier Condo Owners Ass'n, Civil Action No. 17-10153 SECTION: "E" (E.D. La. Mar. 23, 2020).

constructive knowledge of who they were letting in, and what he kept doing, yet did nothing to

end it. There can be no speculation as to the harm.

## VIII.    Negligence (Chapter 258)

Defendants repeatedly contend there is "no allegation" that Monica Blazic is

being sued in any other capacity but as director of CHA. The very first paragraph of the

Complaint, however, explicitly states otherwise.[56] Nowhere does the Complaint suggest Ms.

Blazic is not being sued in her individual capacity.[57] Plaintiffs do not accuse Defendants merely

of failures to act. They accuse CHA of originally causing all this, by letting him in.[58]

Discretionary function immunity expressly does not apply in cases where a government official's

actions were mandated by statute or regulation.[59] *All* cases cited by Defendants precede this

---

[56] "The Plaintiffs....bring this lawsuit against...CHA, and its then acting Executive Director, Monica Blazic – for their **individual** and/or collective roles in creating the circumstances which directly and proximately caused the murder of Mr. Arocho" [emphasis added].

[57] The First Circuit adopted a course of proceedings approach to determining whether a suit is an individual or official capacity suit See Cocroft v. Smith, 95 F.Supp.3d 119, 128 (D. Mass. 2015) (quoting Powell v. Alexnader, 391 F.3d 1, 22 (1st. Cir. 2004)). "Under this test, rather than relying solely on the face of the complaint, that court looks to the substance of the pleadings and the course of the proceedings, and considers factors such as the nature of the plaintiff's claims, including whether compensatory and/or punitive damages have been requested, the nature of the defenses raised (including qualified immunity), as well as the stage of the litigation." Hourihan v. Bitinas, Civil Action No. 16-cv-11734-ADB, 2018 WL 10246994, at *3 (D. Mass. June 27, 2018), aff'd, 811 Fed.Appx. 11 (1st Cir. 2020) (quoting Cocroft, 95 F.Supp.3d at 128). See also Hayes v. Town of Dalton, 3:21-cv-30055-KAR (D. Mass. Feb. 17, 2022) where, even while the complaint did not specify whether each was brought against the defendant in their individual or official capacity (or both), for purposes of the 12(b)(6) opinion, the federal claims of the Hayes were treated as claims against Town employees were treated as claims against them in their individual capacities.

[58] Nevertheless, Plaintiffs could argue that each time Urimagua *re*-offended, after originally being allowed in, each occasion created a fresh "original cause", because each time CHA defied its own non-discretionary policy regarding violence, threats, and harassment as it regards Urimagua, each such non-discretionary in-action led to new harmful consequences. For ex., when they affirmatively acted by reaching an agreement with Urimagua in the 2019 case, when he lived at a different CHA community, this led to harmful consequences. When they, for reasons presently unbeknownst transferred him, to GGDRA, next door to another female Hispanic tenant, this led to harmful consequences. When they, for example, chose not to address at least two serious incidents at GGDRA, this led to harmful consequences. Said differently, these instances after Urimagua was originally accepted in, by CHA, are not, per se, distinguishable "failures to act" described under the statute, just as Urimagua cannot be considered a "third person". He was, because of the CHA, a housing authority tenant, just like Mr. Arocho, and Ms. Laracuente.

[59] See Brum v. Town of Dartmouth, 428 Mass. 684 (Mass. 1999) 704 N.E.2d 1147, citing Dobos v. Driscoll, 404 Mass. 634, 652, cert. denied sub nom, and Kehoe v. Dobos, 493 U.S. 850 (1989). In Brum, a mother claimed that a

Court's analysis of 10(j) in <u>Doe v. City of Northampton</u>, Civil Action 23-10358-MGM (D. Mass. Jul. 1, 2024). There, the Court agreed a "Safety and Supervision Plan" constituted an explicit and specific assurance to implicate 10(j)(1)'s immunity exception. The Court took notice of the plan's aim: "securing [the teen girl's] physical and emotional safety at school."[60] This included bullying. Suicide was a foreseeable consequence thereof. The plan showed the school had some duty to protect the young girl, that their inability to do so led her to stop attending school, which compounded psychological harm, and led to her suicide. Not only did CHA have a clear duty to provide safe, decent housing, they authored clearly enunciated written policies to ensure it was so, in accordance with federal and state regulations putting that incumbent duty upon them. Instead, they risked the lives of innocent public housing tenants, time, and time again. All of this began with Urimagua's acceptance into the housing, which CHA, and CHA alone, were the gatekeepers of. Plaintiffs alternatively appear to be entitled to an exception under 10(j)(2).[61]

---

school failed to protect her son from being stabbed by third parties who accessed the school, violating his 14th amendment right to due process. She claimed a statute mandated the school have at least some security measures in place, and as the Court noted (and as Defendants do not mention in discussing this case), "if the school in fact had failed to adopt any security measures at all, claims based on this future failure would not be barred by 10(b) [M.G.L. Chapter 258 § 10(b)]". The issue of immunity under 10(j) was separately addressed, in <u>Brum</u>. 10(j) exempts from the tort claims act any claim based on an act or failure to act to prevent or diminish the harmful consequences of condition or situation, including violent or tortious conduct of a third person which is not originally caused by the public employer or anyone acting on their behalf.

[60] As an example of a seemingly lesser standard for what an explicit and specific assurance, means, in <u>Thomas v. Town of Chelmsford</u>, 267 F. Supp. 3d 279 (D. Mass. 2017), the school's Superintendent told the youth rape victim's parents, verbally, that teachers were in the hallways that monitor things and that her son would be fine. This met the standard of 10(j)(1). Notably, the rape did not occur in the hallways, or even at the school, but at a football camp. By placing Matthew in an unsupervised overnight sports environment with known bullies, the school had taken an affirmative act which was also the original cause, of his injuries. The Court further held that once the municipality was shown to be the "original cause" of the injury, a negligence action can be maintained for subsequent acts or failures to act to prevent or diminish the harmful consequences of even third parties. Thus, if the repeated in-actions by CHA which took place after Urimagua's abysmal application process are not viewed as separate affirmative acts, as fresh original causes, they nevertheless constitute valid grounds for maintaining the negligence claims of the Plaintiffs' Complaint.

[61] Which excepts from the exclusion "any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention;". It appears that there were several instances alleged which may constitute "intervention" of the CHA or its employee(s), responsible

Defendants attempt to convince this Court Urimagua's initial application decision, the settlement of the 2019 eviction case, the review (if it ever occurred) of his continued eligibility, and namely, "how to address complaints regarding a tenant", were *all* discretionary decisions. Pages prior Defendants claimed they were unaware of police activity involving Urimagua at GGDRA in 2020, and 2021 (and evidently, unaware of any other incidents or complaints not involving police). Yet now they mention these as a stand-alone topics of discretionary decision-making. Some level of discretion may be found in certain aspects of an application. Perhaps even the overall decision. But entirely omitting from the application process the crucial screening requirement, to determine who the applicant *is*, that will be living amongst others, who have no say in the matter, is not among those discretionary areas. Even if Defendants could show screening was done, which they never directly claim, the compelled decision is unchanged: denial, and a later housing court agreement in no way alleviates the decision CHA was compelled to make as to continued eligibility.[62] CHA appears almost to commend itself for continuing Urimagua's housing in 2019, yet never mention what happened to Martiza Ortiz. This Court must not be fooled to believe CHA was somehow promoting *anti*discrimination by giving Urimagua some sort of second chance. By their own policy, buttressed by federal and state regulations, there *were* no second chances.

---

for the injuries to these Plaintiffs. Namely, there *had* to have been some level of interference or intrusion against the required screening of applicants, for Urimagua to have been accepted into CHA housing. Further, CHA upon information and belief retained final say and/or authority in the settlement of the 2019 summary process agreement, in which they were represented by counsel. Additionally, their presently unexplained intervention in the lives of at least Mr. Arocho, and Ms. Laracuente, by the CHA-effectuated transfer of Urimagua, to GGDRA. Undeniably Urimagua's presence at GGDRA put Mr. Arocho and Ms. Laracuente, in a worse position than they were in before the transfer initiated by CHA.

[62] Especially given what CHA already would have already known about him, had they ever performed the initial required screening.

24

Since the immunities under section 10 operate in the alternative, as recognized by Defendants, it would appear to go both ways. Meaning, that successful application of those exceptions make the Court's consideration of a 10(b) liability bar unnecessary. Nevertheless, 10(b) does not help the Defendants. The discretionary function exception does not warranty immunity where defendant's conduct occurs while carrying out established policies or plans. The sole case cited by Defendants in this context, again, involved policy making, or planning. There was no required statute, regulation, policy or agency practice, there, that prescribed a course of conduct the city "must" have followed, involving snow accumulation. The case was about a decision as to whether or not to erect a fence. CHA had no discretion to do, or not do, what the Plaintiffs' claim caused the harm. Even if it could be shown CHA was somehow unfettered to their own required policies, CHA is unable to establish that no other policy or practice foreclosed discretion.[63] Playing Russian Roulette with people's lives is not discretionary ,and discovery will reveal the full extent to which CHA's decisions were constrained. See <u>Plante v. Town of Blackstone</u>, No. 092632 (Mass. Cmmw. May. 11, 2010).[64] 10(j) expressly does not bar a plaintiff's claim, for negligent hiring.[65]

---

[63] i.e., the federal and state fair housing laws.

[64] Plaintiffs further point out that when asserting immunity under 10(b), a defendant is expected to point to some evidence, "deposition, affidavit, or otherwise," relevant to the issue of whether the defendant performed discretionary function, as such evidence, as such evidence "can often be readily assembled and presented where it exists." <u>Allen v. Boston</u>, 44 Mass. App. Ct. 679, 681 (1998).

[65] See <u>McConnell v. Dooling</u>, Norfolk County Superior Court, Commonwealth of Massachusetts, Civil Action No. 941503, 1995 WL 809504 (June 7, 1995) (Brady, J) (Docket No. 44, Ex. 12) (10(j) does not bar claim of negligent hiring by not checking the defendant's criminal record; jury could conclude that negligent hiring was "participat[ion] in risk-creating conduct which contributed to the situation which caused the harm.") See also <u>Bonnie W. v. Commonwealth</u>, 419 Mass. 122, 643 N.E.2d 424 (1994), a case cited by Defendants in their brief, <u>Doe v. D'Agostino</u>, 367 F. Supp. 2d 157 (D. Mass 2005), <u>Armstrong v. Lamy</u>, 938 F. Supp. 1018 (D. Mass. 1996). While Plaintiffs have not devoted a separate count to negligent hiring, Ms. Blazic would be one shining example of a negligent hire, as would anyone else who continued the pattern of discrimination.

In a similar case, <u>Giggers v. Memphis Housing Authority</u>, 277 S.W.3d 359 (Tenn. 2009), cited over 300 times, plaintiffs sued the housing authority after a tenant was shot by another tenant, alleging negligence and breach of contract for failing to provide a safe premises. The plaintiffs claimed the authority had neglected to investigate the killer's background, follow required policies impacting his tenancy, and assess the risk he posed. The case emphasized the duty of care MHA had to Giggers. The Court found a "special relationship" exists between a landlord and a tenant, reinforcing an obligation on the authority to take reasonable measures of protection. As more pronounced, here, because any reasonable person could foresee the probability of violence in <u>Giggers</u>, and because the gravity of the potential harm outweighed the authority's burden of taking protective measures for tenant safety, Plaintiffs in <u>Giggers</u> were entitled to recovery on a claim of negligence "under any version of the facts."[66]

## IX. <u>Negligent and/or Intentional Infliction of Emotional Distress</u>

Plaintiffs who witnessed this murder were also directly threatened with murder.[67] Each have a cognizable claim for negligent infliction of emotional distress.[68] In regard to Anna and Yolanda Arocho, Massachusetts law does not require a relative claiming negligent infliction of

---

[66] In <u>Giggers v. Memphis Housing Authority</u>, 363 S.W.3d 500 (Tenn. 2012), the Court clarified that exercising discretion in eviction decisions does not make an operational act discretionary. The Court emphasized that housing authorities must act "within the confines of HUD's preexisting policies" and that negligent acts violating established policies are operational, not protected by discretionary function immunity.

[67] Urimagua reportedly turned to them and said, "Who's next?", as set forth in the Complaint.

[68] See <u>Calderon v. Royal Park, LLC</u>, 96 Mass. App. Ct. 49 (Mass. App. Ct. 2019). There, the thirteen-year-old best friend of a girl struck and killed by a train was found to have a separate cause of action for negligent infliction of emotional distress which arose at the time of the defendant's negligence. Specifically, where Calderon was herself placed within the "zone of danger" created by the defendant's negligence, she was not a bystander, and could recover for emotional distress and injuries caused by witnessing injuries negligently inflicted on another. The Court recognized that such a person is better understood as a "primary victim of the alleged negligence and not one who merely experiences 'distress at witnessing some peril or harm to another'". Specifically, Calderon sufficiently pleaded in the complaint that she suffered anxiety, depression, sleeplessness, night terrors, nightmares, etc., "as a result of being together on the tracks when her best friend was killed". As Calderon was herself in the zone of danger, the Court did not need to decide the issue whether being a "best friend" (rather than having a familial relationship) satisfied the multifactor governing bystander recovery.

emotional distress be at the scene of the harm. Nor does it say anything about where those family members must be domiciled. It requires the shock of the harm follow closely on the heels of the accident. The gut-wrenching shock and sadness Anna and Yolanda experienced followed *immediately* – not hours or months after the fact, as in case cited by Defendants, and it has never faded.[69]

## X. <u>Wrongful death and Survival Action (Chapter 229)</u>

Defendants egregiously misquote this Court's findings in <u>Doe</u>. They inflate one unrelated component of the case to allege, generally, that the wrongful death claim was "subsumed" by the MTCA. <u>Doe</u> merely acknowledged an interaction between the MTCA's presentment requirement (the notice requirement under 258), and the wrongful death statute. As <u>Doe</u> held, MTCA immunity does not apply here because the exclusions, 10(j)(1), or alternatively, 10(j)(2), do. The Court in <u>Doe</u> rejected dismissal of the wrongful death count.[70]

## XI. <u>Remaining Leasehold Claims</u>

Continuing their credo that everything is barred by the MTCA, Defendants here cite <u>Wheeler v. Bos. Hous. Auth.</u>, 34 Mass. App. Ct. 36, 39 (1993), yet another scenario that is plainly distinguishable.[71] The cited exceptions to the liability bars apply.

---

[69] It must be underscored that a plaintiff in such a case retains the right to bring an action against the individual governmental employee involved. Meaning, while 10(c) excludes the public employer from intentional torts committed by a public employee, it does not affect any common law remedies against public employees for these acts. Glannon, Governmental Tort Liability under the Massachusetts Tort Claims Act of 1978, 66 Mass. L. Rev. 7, 12 (1981). See <u>Alves v. Hayes</u>, 381 Mass. 57, 58 (1980); <u>Morash Sons v. Commonwealth</u>, 363 Mass. 612, 624 n. 7 (1973). See also <u>Spring v. Geriatric Authority of Holyoke</u>, 475 N.E.2d 727, 734, n.9 (1985).

[70] The Court also rejected the dismissal of the 1983 count.

[71] Wheeler alleged the housing authority failed to provide adequate security after he was shot during an exchange of gunfire which took place between persons unknown (one of whom being located on the top of a building owned by the authority, and the other, on the ground floor of a parking area owned by defendant). Wheeler was not a tenant of the housing authority and was getting into her car which was parked near to but off housing authority property. Plaintiffs here include tenants of the CHA, who assert that the "physical defect" in the premises – Urimagua, also a tenant – was originally created by CHA, by at least one if not several affirmative acts.

## XII.    Breach of the Covenant of Quiet Enjoyment (Chapter 186 § 14)

Defendants further misrepresent the cases cited in this section of their brief, which in fact buttress the quiet enjoyment claims of Domingo Arocho, Candida Laracuente, and Felicita Figueroa.[72] Defendants improperly conflate the term "affirmative act", as used in the context of MTCA exclusion, with the Court's use of the term "affirmatively act", in Saucier v. Wald, 2018 Mass. App. Div. 4 (Dis. Ct. 2018). But Saucier did not involve a Chapter 258 question at all. It involved a private landlord being asked to deal with harassment of one tenant, by another – not violent conduct affecting numerous public housing tenants, with an imminent threat of danger, or death. Even if Saucier intended to give the same meaning to those words, Urimagua was CHA-created danger. Urimagua *was* the "lengthy, unabated physical condition." The covenant of quiet enjoyment is a term implicit in *every* lease. Plaintiffs Anna and Yolanda Arocho brought this suit on behalf of their father. Mr. Arocho was a tenant of GGDRA, and unquestionably, was entitled to safe, decent housing, without substantial interferences. His own murder, certainly being one of them. Defendants cite no authority for the proposition that Anna and Yolanda Arocho are not

---

[72] Defendants cite Doe v. New Bedford Hous. Auth., 417 Mass. 273 (1994), where the Court held the loss of use of sidewalks, streets, parking lots or recreational areas constituted a substantial interference with the beneficial use of a single apartment in the public housing project. The Court vacated summary judgment for the landlord on a claim of violation of the covenant because the record suggested "that the [landlord] stood idle, despite continued requests and complaints by the tenants…and stood idle when there were certain [corrective] measures that it could have taken relatively easily". The Court in Andover Hous. Auth. v. Shkolnik, 443 Mass. 300, 311 n. 17 (2005) expanded upon the important "equal responsibility" a housing authority has to "all" of its public housing tenants, which it recognized including many disabled and elderly folks. Andover held tenants causing excessively loud and unabated noise were not discriminated against by the authority, as it regarded their eviction. In fact, the Court held "When there was no improvement in the situation [the noise] and the authority continued to receive complaints, it was left with little recourse but to commence eviction proceedings." Blackett v. Olanoff, 371 Mass. 714, 716 (1977) did not hold that a landlord is not "typically" chargeable with the actions of one tenant upon another, under the covenant. Quite the contrary, it held a landlord may (and in fact, was) liable, as a result of the conduct of third parties, because the serious interference with a tenancy was a "natural and probable consequence" of what the landlord did, failed to do, or what he permitted be done. In Blackett, the landlord leased to others a nearby building for use as a cocktail lounge, causing the residential tenants to be subjected to loud music and disturbances into the early morning hours. The Court specifically noted, as is the case here, that Blackett had the ability to control the objectionable conditions but failed to do so. An interference such as the lack of light, heat or power, while commonly advanced as claims in this context, may in fact be *less* substantial forms of interference as the heinous criminal activity at GGDRA.

entitled to pursue Mr. Arocho's claim for Defendants' breach of the covenant of quiet enjoyment because they live in New York, or because they bring the claim in a representative capacity. Ms. Laracuente has *clearly* stated a viable claim for Defendants' breach of the covenant of quiet enjoyment for what she endured living next door to a killer. Felicita Figueroa was a CHA tenant. Defendants never claim they screened Urimagua in any capacity – not at the time of his application, nor after various alarms he should have set off under the CHA policy post-acquisition. Discovery will reveal the extent of complaints or incidents reported to CHA by Ms. Laracuente (or any other tenant of GGDRA, or Edward J. Bury, etc) regarding Urimagua.[73] If as Defendants acknowledge an authority can breach the covenant by failing to take action regarding excessive and largely unabated *noise*, why would an authority's creation of and repeated affirmation of the likes of Urimagua, be any different? Defendants cite no authority for the proposition that Defendants did not also have a duty to exercise reasonable care to assure that tenant's guests were not subject to an unreasonable risk of harm.[74]

## XIII.   Breach of Contract

For the reasons stated above, Mr. Arocho, Ms. Laracuente, and Ms. Figueroa have stated viable claims for material and substantial breaches of their leases with CHA. Their claims are not subject to dismissal. The case cited by Defendants – Jablonski v. Casey – did not even involve a breach of contract claim, and the only reason no violation of quiet enjoyment was found there is because the landlord immediately repaired the claimed defects, and all conditions were

---

[73] For example, if the Chicopee Police really did not notify the Chicopee Housing Authority, of incidents such as those which occurred in 2020, and 48 hours prior to Mr. Arocho's murder. CHA headquarters is located *right* around the corner, from GGDRA.

[74] The Supreme Judicial Court of Massachusetts' holding in Young v. Garwacki, 380 Mass. 162 (1980) appears to provide some direction on this issue, however.

adequately addressed. The exact opposite is true, here. The defect was never adequately

addressed until Urimagua was arrested.

### XIV.    Breach of Warranty of Habitability

Defendants have again misstated the applicable statutory and case law regarding the

implied warranty of habitability. The Court has long done away with the theory that the warranty

affords a tenant compensation only for economic loss. It affords compensation for personal

injury, as well. See Crowell v. McCaffrey, 377 Mass. 443 (1979), and Young v. Garwacki, 380

Mass. 162 (1980). In Young, the Court explicitly did away with the "ancient law" barring a

tenant's guest from recovering compensation from a landlord for injuries caused by negligent

maintenance of areas rented to a tenant. Previously, the protections for guests were limited to

common area maintenance. In Scott v. Garfield, 454 Mass. 790 (2009), the Supreme Judicial

Court directly held for the first time that a guest of a tenant may recover from a landlord for

breach of the implied warranty.[75]

Defendants move to dismiss all of Plaintiffs' claims at the pleading stage, by making

limited conclusory statements buttressed by misapprehension of the legal claims, blind to the

overwhelming facts. The Motion is ill conceived, rife with misrepresented law, and should be

denied.

---

[75] As in Massachusetts, New York's warranty of habitability contains an implied warranty of habitability which requires that occupants will not be subjected to conditions that are dangerous, hazardous or detrimental to their life, health or safety, and here, is affirmatively obligated to do so. See Francis v. Kings Park Manor, Inc., 992 F.3d 67 (2d. Cir. 2021). There does not need to be a sanitary or building code violation for there to be a breach of the implied warranty of habitability. Doe v. New Bedford Hous. Auth. is readily distinguishable because it involved an *uninvited* person engaged in unlawful activities, or the failure to provide security services. See instead, Walls v. Oxford Management Co., 137 N.H. 653 (N.H. 1993) 633 A.2d 103, discussed in Doe, which held that a landlord may be liable for a criminal attack on a tenant where he is responsible for a known defective condition on the premises that foreseeably enhanced the risk of attack, or if he negligently performed a voluntary undertaking to provide security. Specifically, the Court held its ultimate finding there "in no way" limited a tenant's recovery when a landlord has violated an express agreement, or "has invited such an attack through violation of an express housing code requirement".

Respectfully Submitted,
The Plaintiffs,
By Their Attorneys:

Cornelius W. Phillips, III
DUNN & PHILLIPS, P.C.
59 Arnold Street
Westfield, MA 01085
(413) 562-8300
Fax: (413) 562-8600
cwp@dunnandphillips.com
BBO# 398280

Richard C. Morrissey, Esq.
Law Offices of Richard Morrissey
20 Valley View Circle
West Springfield, MA 01089
P: (413) 896-0603
attyrmorrissey@gmail.com
BBO# 356320

Dated: November 15, 2024

## CERTIFICATE OF RULE 7.1 CONFERENCE

We, the undersigned, hereby certify that we participated in conferring with Defendants' counsel in an effort to narrow or resolve the issues raised in the Defendants' Motion, and such meeting was unsuccessful.

_____
Cornelius W. Phillips, III

_____
Richard C. Morrissey, Esq.

## CERTIFICATE OF SERVICE

I, Cornelius W. Phillips, III, do hereby certify that on this 15th day of November 2024, I served a true copy of the foregoing document upon counsel of record for Defendants, via electronic mail, return receipt requested, and via the United States District Court's electronic filing system.

_____
Cornelius W. Phillips, III