UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNA AROCHO & YOLANDA AROCHO, individually and as-to-be-named personal representatives of the Estate of Domingo Arocho, CARMEN LOZADA-TORRES, JESSENIA MARTINEZ, CANDIDA LARACUENTE, FELICITA FIGUEROA, JECKSON RODRIGUEZ-LARACUENTE, and JOHN and/or JANE DOE(S), | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Case No. 3:24-cv-30123-KAR ) ) |
| v. | ) ) |
| CHICOPEE HOUSING AUTHORITY, MONICA BLAZIC, and PAUL and/or PAULINE POE(S), | ) ) ) ) |
| Defendants. | ) ) |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 7)

ROBERTSON, U.S.M.J.

After Urimagua-Guraboa,[1] a resident of the Governor George G. Robertson apartments

("Apartments") in Chicopee, killed his neighbor's visitor, a resident and visitors to the

Apartments and the decedent's daughters brought suit against the Chicopee Housing Authority

("CHA"), the agency that owned and controlled the Apartments, and Monica Blazic, its

executive director (collectively, "Defendants").  The plaintiffs claim that by ignoring Urimagua-

Guraboa's violent history and permitting him to reside in the Apartments, Defendants violated

---

[1] The plaintiffs allege that Urimagua-Guraboa was formerly known as Samuel Diaz and has used several aliases and different versions of his former name (Dkt. No. 1-1 at 5-6).

Title VIII of the Civil Rights Act of 1968, the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq. (Count I), denied the plaintiffs' civil rights (Count II), and conspired to interfere with those rights in violation of 42 U.S.C. § 1985(3) (Count III).  The plaintiffs further claim that Defendants violated the Massachusetts Fair Housing Act ("MFHA"), Mass. Gen. Laws ch. 151B (Count IV), the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I (Count VI), and the Massachusetts Declaration of Rights (Count VII), were negligent (Counts V, VIII, IX, X, XI, XII), are liable for the decedent's wrongful death (Counts XIII, XIV), and breached the tenants' right of quiet enjoyment, contracts with the CHA, and warranty of habitability (Counts XV, XVI, XVII).  Defendants have moved to dismiss all counts.  The parties have consented to this court's jurisdiction (Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court GRANTS Defendants' motion to dismiss in part and REMANDS the state law claims to the Superior Court Department of the Massachusetts Trial Court, Hampden County.

I.    Facts Alleged in the Complaint

The court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in favor of the non-moving parties.  *See Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc.*, 920 F.3d 111, 114 (1st Cir. 2019) (citing *Fantini v. Salem State Coll.,* 557 F.3d 22, 26 (1st Cir. 2009)).

The CHA is a public housing authority that owns and operates the Apartments, which receive federal and state funding (Compl. ¶ 14).  Eligibility for admission to and residency in the Apartments is governed by requirements of the United States Department of Housing and Urban Development ("HUD"), which are incorporated into the CHA's Admissions and Continued

Occupancy Policy ("Policy") (Compl. ¶ 15).  The Policy, which is binding on applicants,

residents, and the CHA, describes as objectives:

> [To promote] the overall goal of safe, decent and sanitary housing in good
> neighborhoods by . . . [l]awfully denying admissions or continued occupancy to
> families whose presence in a public housing neighborhood is likely to adversely
> affect the health, safety or welfare of other residents or the physical environment
> of the neighborhood.

> [To comply] . . . with Title VI of the Civil Rights Act of 1964 and other
> applicable Federal and [state] laws and regulations to insure that admission to and
> occupancy of public housing neighborhoods is conducted without regard to race,
> color, creed, age, sex, handicap, familial status, sexual orientation, gender
> identity, or national origin.

(Compl. ¶¶ 16, 17).

As to admission, the Policy requires "the applicant family" to have "no record of

disturbance of neighbors, destruction of property, unsafe living habits, unsanitary housekeeping

practices, alcohol abuse, substance abuse, [and] sexual deviation [and] no history of criminal

activity for three (3) years which, if continued, could adversely affect the health, safety or

welfare of other residents."  In addition, "applicants may be denied admission for five (5) years

for '[a]n arrest or conviction record that indicates that the applicant may be a threat and/or

negative influence on other residents.'"  As to applicants who have been arrested for a crime:

> The fact that there has been an arrest for a crime is not a basis for the requisite
> determination that the relevant individual engaged in criminal activity warranting
> denial of admission, termination of assistance, or eviction . . . . [but the CHA]
> may make an adverse housing decision based on the conduct underlying an arrest
> if the conduct indicates the individual is not suitable for tenancy . . . .

(Compl. ¶ 19).  The CHA is responsible for requesting an applicant's Criminal Offender Record

Information ("CORI") (Compl. ¶ 22).

Eligibility for continued residency in CHA communities is limited to "those residents . . .

[w]ho do not have a history of criminal activity which, if continued, could adversely affect the

3

health, safety, or welfare of other residents . . . ." (Compl. ¶ 20).  The Policy states that the CHA

"shall commence eviction proceedings of the resident family for: . . . [a]ny other criminal activity

on or off the premises. . . . The CHA has a 'one strike' or 'zero tolerance' policy with respect to

violations of lease terms regarding drug-related and other criminal activities" (Compl. ¶ 21).

The plaintiffs allege on information and belief that Defendants approved Urimagua-

Guraboa's application for housing before February 21, 2019 and placed him in a unit located at

49 Benoit Circle in Chicopee (Compl. ¶ 26).  They further assert, based on an on-line search, that

Urimagua-Guraboa was charged with first degree murder or "attenuated murder and violations of

the weapons law" in Puerto Rico in April 2010 (Compl. ¶ 29).  The plaintiffs complain that

Defendants failed to sufficiently verify Urimagua-Guraboa's personal and criminal history

before accepting him as a tenant (Compl. ¶ 27 & n.5).  On or about February 21, 2019,

Urimagua-Guraboa assaulted his neighbor at Benoit Circle by grabbing her neck and threatening

to kill her (Compl. ¶ 30 & n.7).  Urimagua-Guraboa was charged with assault and battery, threat

to commit a crime, and assault and battery by means of a dangerous weapon (Compl. ¶¶ 31, 33).

A nolle prosequi was entered in the case on June 3, 2019 when the victim did not respond to a

summons (Dkt. No. 8-1).

On February 25, 2019, Blazic served Urimagua-Guraboa with a notice to quit stating that

the "CHA has received a police report on February 21, 2019 that you [Urimagua-Guraboa] were

involved in criminal activity by threatening your neighbor . . . with physical violence.  You have

been charged with a felony and 2 misdemeanors" (Compl. ¶ 32).  Urimagua-Guraboa was

notified that he had violated Lease Section I.B., which prohibited tenants from injuring,

endangering, threatening, harassing, or unreasonably disturbing other residents and other persons

lawfully in the unit or on CHA property (Compl. ¶ 32).  On or about March 22, 2019,

Defendants served Urimagua-Guraboa with a "Summary Process (Eviction) Summons and Complaint" to vacate the Benoit Circle apartment for violating Lease Section I.B. (Compl. ¶ 34). Some three weeks later, the CHA and Urimagua-Guraboa reached an agreement whereby the CHA agreed to stay the eviction for six months on the condition that Urimagua-Guraboa would stay away from the neighbor he had assaulted (Compl. ¶ 35). The summary process case was dismissed (Compl. ¶ 36). Following Urimagua-Guraboa's assault on his neighbor, Defendants relocated him to the Apartments in a unit next door to plaintiff Candida Laracuente (Compl. ¶ 36).

On or about June 18, 2020, Chicopee police responded to a call about an incident involving Urimagua-Guraboa and Laracuente (Compl. ¶ 37). Laracuente reported that Urimagua-Guraboa had threatened her and other neighbors, stating that he had killed in the past and would kill again. Laracuente told police that she felt the threat was directed at her and she feared for her safety because Urimagua-Guraboa had previously "verbally assaulted" her (Compl. ¶¶ 37, 38 & n.9). On September 8, 2021, Laracuente contacted the Chicopee police to report that Urimagua-Guraboa had again threatened her and others (Compl. ¶ 39). Urimagua-Guraboa denied threatening anyone, but said he would harm anyone who entered his apartment without permission (Compl. ¶ 40).

Two days later, on September 10, 2021, Urimagua-Guraboa fatally stabbed Laracuente's friend, Domingo Arocho, a visitor to her apartment (Compl. ¶ 41). Urimagua-Guraboa also tried to stab Laracuente, but she escaped (Compl. ¶ 41). After Urimagua-Guraboa attacked Arocho, he shouted, "Who's next?" as he walked back to his unit holding a bloody knife (Compl. ¶ 42). Plaintiffs Felicita Figueroa, Jeckson Rodriguez-Laracuente, Carmen Lozada-Torres, and Jessenia

Martinez, who were visiting the Apartments on September 10, 2021, witnessed the murder

(Compl. ¶¶ 1, 2, 4, 5, 41; Dkt. No. 15 at 4 n.9).[2]

On August 23, 2024, the plaintiffs filed suit in state court (Dkt. No. 1-1 at 5, 25, 26).

Defendants timely removed the case to this court (Dkt. No. 1).

II.      Standard of Review

To survive a motion to dismiss, a "'complaint must contain enough factual material to

raise a right to relief above the speculative level . . . and state a facially plausible legal claim,'"

*Guerra-Delgado v. Popular, Inc.*, 774 F.3d 776, 780 (1st Cir. 2014) (alteration in original)

(quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)), "accept[ing] as

true well-pleaded facts in the complaint and draw[ing] all reasonable inferences in the pleader's

favor." *Id.* (citing *Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).  In resolving a

motion to dismiss, the court employs a two-step approach.  *See Medina-Velázquez v. Hernández-*

*Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Ocasio-Hernández*, 640 F.3d at 12).

> First, [the court] "must separate the complaint's factual allegations (which must be
> accepted as true) from its conclusory legal allegations (which need not be
> credited)." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013)
> (internal quotation marks omitted).  Second, [the court] "must determine whether
> the remaining factual content allows a reasonable inference that the defendant is
> liable for the misconduct alleged."  *Id.* (internal quotation marks omitted).

*Medina-Velázquez*, 767 F.3d at 108.  While "a complaint need not plead facts sufficient to make

out a prima facie case or allege all facts necessary to succeed at trial," *id.* (citing *Carrero-Ojeda*

---

[2] While the complaint is unclear as to the reason for their presence at the Apartments on the date
of Arocho's murder, the plaintiffs' opposition to the motion to dismiss states that Figueroa and
Rodriguez-Laracuente were visiting the Apartments on September 10, 2021 (Dkt. No. 15 at 4
n.9).  The court is entitled to rely on concessions made in an opposition to a motion to dismiss,
*see Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020), and therefore relies on the clarification of
the status of Figueroa and Rodriguez-Laracuente set forth in the plaintiffs' opposition to the
motion to dismiss.

*v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[ ] 'part of the background against which a plausibility determination should be made.'" *Id.* (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)). "An analysis of plausibility is '"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."'" *Id.* at 109 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)). That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.'" *Id.* at 12-13 (third alteration in original) (quoting *Twombly*, 550 U.S. at 556).

III.    Analysis

A.    Federal Claims (Counts I, II, and III)

Defendants argue that the plaintiffs have not satisfied the threshold jurisdictional requirement of constitutional standing (Dkt. No. 8 at 3-5). Defendants further assert that, even if some or all of the plaintiffs have standing, they have not stated plausible claims for violations of §§ 3604 and 3617 of the FHA, the Due Process and Equal Protection Clauses of the Constitution, or 42 U.S.C. § 1985(3). The court addresses Defendants' contentions as to the federal claims in turn.

1.    Standing

"Standing is a 'prerequisite to a federal court's subject matter jurisdiction' and 'therefore must be resolved before a court may reach the merits.'" *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 31 (D. Mass. 2023) (citations omitted). The Constitution limits a court's

jurisdiction to actual cases or controversies.  *See* U.S. Const. art. III, § 2.  To meet the

constitutional standing requirement, a plaintiff must show that he or she "'(1) suffered an injury

in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

to be redressed by a favorable judicial decision.'"  *Conservation Law Found., Inc. v. Acad.*

*Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330,

338 (2016)).  "These three requirements aim to ensure that a plaintiff has 'such a personal stake

in the outcome of the controversy as to warrant . . . federal-court jurisdiction.'"  *Id.* (alteration in

original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

        "To qualify as an injury-in-fact, a complained-of harm must be 'concrete and

particularized' and 'actual or imminent.'"  *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).  "An injury is concrete when it is 'real and

not abstract,' though it need not be 'tangible' or large . . . ."  *Id.* (citation omitted).  "Particularity

requires plaintiffs to demonstrate that they have personally suffered some harm, and the 'actual

or imminent' requirement 'ensures that the harm has either happened or is sufficiently

threatening.'"  *Louis,* 685 F. Supp. 3d at 31 (quoting *Katz v. Pershing, LLC,* 672 F.3d 64, 71 (1st

Cir. 2012)).  "Finally, when assessing standing, a court should consider 'whether the alleged

injury to the plaintiff has a "close relationship" to a harm "traditionally" recognized as providing

a basis for a lawsuit in American courts.'"  *Conservation Law Found, Inc.,* 129 F.4th at 87

(quoting *TransUnion LLC v. Ramirez,* 594 U.S. 413, 424 (2021)).  The traceability component of

standing "ensures that a plaintiff's injury is 'causally connected' to the '"allegedly unlawful

conduct" of which the plaintiff[ ] complain[s].'"  *Brito v. Garland*, 22 F.4th 240, 253 (1st Cir.

2021) (alterations in original) (quoting *California v. Texas*, 593 U.S. 659, 669 (2021)).  "This

connection cannot be 'overly attenuated' and cannot stem from the independent action of a third

party." *Louis*, 685 F. Supp. 3d at 31 (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)).

Defendants argue that the complaint fails to state facts showing that the plaintiffs were subjected to discriminatory conduct and therefore fails to establish the required injury-in-fact element of standing (Dkt. No. 8 at 3-5).  For their part, the plaintiffs claim that they suffered emotional injuries arising from race or national origin discrimination insomuch as the Apartments were a nearly all-Hispanic community and Defendants, personally or through their employees, made derogatory comments about Hispanics and, because of their alleged bias and disdain, failed to evict Urimagua-Guraboa from the Apartments although they knew about his propensity for violence (Dkt. No. 1-1 at 5-6; Compl. ¶¶ 23, 24, 25, 51, 52, 58, 59).

"[S]tanding is not dispensed in gross." *Lewis v. Casey,* 518 U.S. 343, 358 n.6 (1996).  "The appropriate inquiry must be 'whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.'" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016) (quoting *Pagán v. Calderón,* 448 F.3d 16, 26 (1st Cir. 2006)); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006).  In compliance with this directive, the court turns first to an assessment of the federal claims asserted by Lozada-Torres, Martinez, Figueroa, and Rodriguez-Laracuente, who were visitors to the Apartments when they witnessed Arocho's murder on September 10, 2021 (Compl. ¶¶ 1, 2, 4, 5, 41, 44; Dkt. No. 15 at 4 n.9).

The FHA permits an "aggrieved person" to commence a civil action to challenge a discriminatory housing practice.  42 U.S.C. § 3613(a)(1)(A).  The Supreme Court most recently addressed standing under the FHA in *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017), in which the Court stated:

> [W]e presume that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law

invoked." [*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)] (internal quotation marks omitted). [The Court has] added that "[w]hether a plaintiff comes within the 'zone of interests' is an issue that requires [the Court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.*, at [127] (some internal quotation marks omitted).

*Bank of Am. Corp.*, 581 U.S. at 197 (fourth alteration in original). "The FHA is intended 'to provide within constitutional limitations, for fair housing throughout the United States.'" *Barnett v. Pickering*, No. 09-CV-264-PB, 2010 WL 144359, at *2 (D.N.H. Jan. 8, 2010) (quoting 42 U.S.C. § 3601. The Supreme Court has acknowledged standing under the FHA for plaintiffs suing to vindicate or advance the right to live in an integrated or racially balanced community. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (allowing suit by a nonprofit organization that used funds to combat housing discrimination); *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979) (allowing suit by a village alleging that racial steering practices had undermined the racial balance of its neighborhoods and caused it to lose tax revenue); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209-10 (1972) (allowing suit by white tenants alleging that racially discriminatory rental practices deprived them of the benefit of living in an integrated apartment complex).

Lozada-Torres, Martinez, Figueroa, and Rodriguez-Laracuente were not residents in the Apartments, and their claims are based exclusively on the emotional distress they claim to have suffered as a result of witnessing a violent event (Compl. ¶ 44). The complaint does not allege that Lozada-Torres, Martinez, Figueroa, or Rodriguez-Laracuente were denied housing because of ethnicity or experienced discriminatory harassment by Defendants or any employee or agent of the CHA, nor does it allege that these plaintiffs took any step to oppose discriminatory housing practices by the CHA, provided assistance to those suffering from or opposing such practices, or sought to

advance the racial balance among the Apartment's tenants.  To the extent Mr. Arocho's
murder could be said to have been caused by discriminatory housing practices, the claims
of these bystanders and the nature of the injuries for which they seek to recover are so
distantly related to the interests intended to be advanced by the FHA that these four
plaintiffs cannot be said to be in the zone of interests protected by the FHA.  These
plaintiffs "lack standing where they allege a [violation of the Fair Housing Act], but 'fail
to identify any personal injury suffered by them, as a consequence of the alleged
constitutional error, other than the psychological consequence presumably produced by
observation of conduct with which one disagrees.'"  *Johnson v. Curry*, No. 3:21-cv-726-
MMH-PDB, 2023 WL 3854985, at *10 (M.D. Fla. Apr. 4, 2023) (quoting *Valley Forge
Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485
(1982)).

The cases on which the plaintiffs rely to support standing on the part of Lozada-Torres,
Martinez, Figueroa, and Rodriguez-Laracuente for purposes of the FHA are distinguishable.  The
complaint does not allege that Lozada-Torres, Martinez, Figueroa, or Rodriguez-Laracuente
sought to aid any resident in opposing Defendants' allegedly discriminatory conduct, or that they
had a close familial relationship with someone grievously injured by discrimination directed at a
tenant or tenants.  *Contrast Fernandez v. Orlando Hous. Auth.*, Case No: 6:15-cv-1341-Orl-
40DAB, 2016 WL 2784989, at *4 (M.D. Fla. May 13, 2016) (holding that the plaintiff, who had
repeatedly attempted to aid her blind father in obtaining reasonable accommodations for his
disabilities, had standing under the FHA to bring suit based on the allegation that discriminatory
treatment led to his death).  Nor does the complaint allege that Lozada-Torres, Martinez,
Figueroa, or Rodriguez-Laracuente were aware of Defendants' allegedly discriminatory conduct

and were dissuaded from visiting the Apartments because of such discrimination against Hispanic residents. *Contrast Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1141-42 (E.D. Ca. 2004) (holding that friends of apartment complex residents who witnessed racial harassment of the residents and were allegedly dissuaded from visiting the complex because of discriminatory failure to provide law enforcement protection had standing to assert claims under the FHA).

Accepting that the FHA's definition of a "person aggrieved" reflects a congressional intent to confer standing to the extent permitted under Article III, *Bank of Am. Corp.*, 581 U.S. at 197-98, and drawing all reasonable inferences from the complaint in the plaintiffs' favor, any connection between Defendants' alleged discriminatory conduct and the injuries claimed by plaintiffs Lozada-Torres, Martinez, Figueroa, and Rodriguez-Laracuente is so exceptionally tenuous that "[r]ecognition of standing in such circumstances would transform the federal courts into "'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (citation omitted).

For a similar reason, these four plaintiffs lack standing to assert the claims in Counts II and III. "The Constitution does not protect against all intrusions on one's peace of mind." *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991), *overruled on other grounds by Gonpo v. Sonam's Stonewalls & Art, LLC,* 41 F.4th 1 (1st Cir. 2022). "A claimed injury which is 'shared in substantially equal measure by all or a large class of citizens,' does not justify the exercise of the court's jurisdiction." *Nogueras Cartagena v. María Calderón*, 150 F. Supp. 2d 338, 343 (D.P.R. 2001) (quoting *Warth v. Seldin,* 422 U.S. 490, 499 (1975)). Further, when standing is challenged, a plaintiff must show that the injury alleged has a close relationship to a harm traditionally recognized as providing a basis for recovery. *See Conservation Law Found.*, *Inc.,* 129 F.4th at 87. First Circuit caselaw holds that surviving family members cannot recover for

their emotional distress arising from a victim's death unless the alleged constitutional violation was aimed at their familial relationship.  *See Robles-Vasquez v. Tirado Garcia*, 110 F.3d 204, 206 n.4 (1st Cir. 1997).  Where family members cannot recover for injuries or deaths caused by unconstitutional practices, bystanders with no personal relationship to the injured parties surely lack cognizable claims.  In summary, "[t]he acts complained of did not result in a physical touching or physical injury, and, thus, fall short of the type of conduct which the due process clause was intended to protect."  *Pittsley*, 927 F.2d at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973), *overruled on other grounds by Graham v. Connor,* 490 U.S. 386 (1989); *Bibbo v. Mulhern*, 621 F. Supp. 1018, 1025 (D. Mass. 1985)).  The court finds that plaintiffs Lozada-Torres, Martinez, Figueroa, and Rodriguez-Laracuente lack standing to bring any of the federal claims they assert based on the facts and injuries alleged in the complaint.

In contrast, Laracuente resided at the Apartments (Compl. ¶ 3).  The complaint asserts that she had direct injuries arising from Defendants' discriminatory conduct in failing to address Urimagua-Guraboa's violent conduct, that she sought to address the problem by calling the police to report his violent behavior, and that the Defendants were aware of her complaints (Compl. ¶¶ 36-39, 41).  She asserts, based on her status as a resident, that Defendants discriminated against her in violation of the FHA and the Constitution by permitting Urimagua-Guraboa to continue residing at the Apartments with knowledge of his history of violence and by other discriminatory conduct and that she experienced emotional distress because of racial discrimination (Compl. ¶¶ 25, 30, 35, 36, 44, 49, 51, 52, 58, 59, 60).  In the court's view, Laracuente has standing to bring the federal claims asserted in Counts I, II, and III.  *See, e.g., Trafficante*, 409 U.S. at 212.

As to the decedent's daughters, Anna and Yolanda Arocho ("the Arochos"), who were New York residents and who, so far as appears from the complaint, have never visited the Apartments, the complaint states that they are bringing claims individually and as yet to-be-named personal representatives of their father's estate without identifying which, if any, claims they are asserting under the FHA or § 1983 (Dkt. No. 1-1 at 5 n.1; Compl. ¶¶ 6, 7, 45, 141).  The Arochos do not claim that they attempted to assist their father in exercising or enjoying his rights under the FHA, nor have they otherwise stated personal claims under the FHA.  *Compare Fernandez,* 2016 WL 2784989, at *4.  To the extent the Arochos allege that Defendants violated their rights by failing to evict Urimagua-Guraboa, "First Circuit case law holds that surviving family members cannot recover in an action brought under § 1983 for deprivation of rights secured by the federal constitution *for their own damages* from the victim's death unless the unconstitutional action was aimed at the familial relationship."  *Robles-Vazquez,* 110 F.3d at 206 n.4 (citing *Manarite v. City of Springfield,* 957 F.2d 953, 960 (1st Cir. 1992)).  There is no such allegation here, nor could there be.  The Arochos lack standing to bring the claims asserted in Counts II and III for their personal damages arising out of their father's death.

To the extent the Arochos are asserting a cause of action under the FHA on behalf of their father, at least one appellate court has held that FHA claims survive the death of a party under federal common law.  *See Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 109-10 (3d Cir. 2017).  Because "[a]n action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1), if the real party in interest dies, the executor or administrator of his estate may prosecute the action on his behalf.  *See* Fed. R. Civ. P. 17(a)(1)(A)-(B).  In Massachusetts, an executor or administrator appointed by the probate court is the personal representative of the estate and, thus, may prosecute an FHA claim of a decedent.  *See Flynn v.*

*Flynn*, 67 N.E. 314, 314 (Mass. 1903); Mass. Gen. Laws ch. 190B, § 3-103.  To the extent the Arochos are asserting claims under 42 U.S.C. § 1983 for Defendants' alleged violations of their father's constitutional rights, "federal law does not address whether an action under that section survives the death of the party whose rights have allegedly been violated.  Rather, a plaintiff's capacity to bring suit for violations that allegedly caused a person's death is generally controlled by state law governing survivorship and wrongful death actions."  *Nordberg v. Town of Charlton*, Civil Action No. 11-40206-FDS, 2012 WL 2990763, at *3 (D. Mass. July 19, 2012) (citing 42 U.S.C. § 1988(a); *Robertson v. Wegmann,* 436 U.S. 584, 590 (1978)).  The Massachusetts survival statute provides, "[i]n addition to the actions which survive by the common law, . . . [a]ctions of tort . . . for assault, battery, imprisonment or other damage to the person" shall survive.  Mass. Gen. Laws ch. 228, § 1(2)(a).  Other sessions of this court have held that, "'section 1983 claims constitute action "in tort" for "damage" within the meaning of the Massachusetts survival statute, Mass. Gen. Laws ch. 228, § 1.'"  *Weichel v. Town of Braintree*, Civil Action No. 1:20-cv-11456-IT, 2025 WL 863598, at *2 (D. Mass. Mar. 18, 2025) (citation omitted) (collecting cases).  "Under Massachusetts law, an action that survives the death of the claimant generally may be commenced only by the executor or the administrator of the decedent's estate."  *Nordberg*, 2012 WL 2990763, at *3 (citing Mass. Gen. Laws ch. 230, § 1). *See* Mass. Gen. Laws ch. 229, § 2 ("Damages [for wrongful death] shall be recovered in an action of tort by the executor or administrator of the deceased."); *Marco v. Green,* 615 N.E.2d 928, 930 (Mass. 1993) (same).  Consequently, like suits under the FHA, § 1983 actions can be brought by an executor or administrator.

As far as can be determined from the complaint, neither of the Arochos had been appointed as a personal representative of their father's estate when the complaint was filed (Dkt.

No. 1-1 at 5 n.1; Compl. ¶¶ 45, 141).  Because standing in federal court is determined at the time

the suit is filed, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992), the Arochos

lacked standing to bring the federal claims when the case was filed.  However, an appointment as

personal representative may relate back to the filing of an original complaint.  *See* Mass. Gen.

Laws ch. 190B, § 3-701 ("The duties and powers of a personal representative commence upon

appointment.  The powers of a personal representative relate back in time to give acts by the

person appointed which are beneficial to the estate occurring prior to appointment the same

effect as those occurring thereafter."); *Estate of Gavin v. Tewksbury State Hosp.,* 9 N.E.3d 299,

309 & n.23 (Mass. 2014).  Therefore, the court declines to dismiss the Arochos' claims on behalf

of their father's estate on standing grounds at this time.

The court turns to whether the complaint states viable federal claims to the extent the

plaintiffs have standing.

### 2.    Count I: Violation of the Fair Housing Act

The plaintiffs claim that Defendants violated §§ 3604 and 3617 of the FHA by permitting

Urimagua-Guraboa, "a known violent individual with a criminal history" to live among them in

violation of the provision in CHA's Policy that promoted a safe environment (Compl. ¶¶ 46-55).

Defendants seek dismissal on the ground that the plaintiffs' FHA claims are barred by the statute

of limitations (Dkt. No. 8 at 5-6).

Section 3613(a)(1)(A) of the FHA states, in pertinent part:

> An aggrieved person may commence a civil action in an appropriate United States
> district court or State court not later than 2 years after the occurrence or the
> termination of an alleged discriminatory housing practice, . . . whichever occurs
> last, to obtain appropriate relief with respect to such discriminatory housing
> practice or breach.

"This period does not include 'any time during which an administrative proceeding under [Title 42, Chapter 45, Subchapter I] was pending with respect to a complaint or charge under this subchapter based upon such discriminatory practice.'" *Dickinson v. Zanesville Metro. Hous. Auth.*, 975 F. Supp. 2d 863, 876 (S.D. Ohio 2013) (alteration in original) (quoting 42 U.S.C. § 3613(a)(1)(B)).

Unless the tolling provision applies, "[c]laims under the FHA are subject to a two-year statute of limitations." *Paulsen v. Great Bridge Attleboro Ltd. P'ship*, 552 F. Supp. 3d 160, 163 (D. Mass. 2021) (citing 42 U.S.C. § 3613(a)(1)(A)). "Those claims accrue at the time the alleged discriminatory housing practices occurs or terminates, whichever is later." *Id.* (citing 42 U.S.C. § 3613(a)(1)(A)). "A defendant may assert a statute of limitations defense in a motion to dismiss if 'the facts establishing the defense are clear on the face of the plaintiff's pleadings.'" *Id.* (quoting *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (internal quotation marks and citation omitted)). "Granting a motion to dismiss on limitations grounds is appropriate, therefore, only when the complaint 'leave[s] no doubt that an asserted claim is time-barred.'" *Id.* (alteration in original) (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)). Reviewing "the facts found within the four corners of the complaint," *Cheng v. Neumann*, No. 2:21-cv-00181-LEW, 2022 WL 326785, at *2 (D. Me. Feb. 3, 2022), the final injury arising from discrimination that is alleged by the plaintiffs who, in the court's view, have standing to assert federal claims – Laracuente and the Arochos – occurred on September 10, 2021, when Urimagua-Guraboa killed Arocho (Compl. ¶ 41). Accordingly, the complaint should have been filed on or before September 10, 2023. The plaintiffs did not file the complaint in state court until August 23, 2024, almost a year beyond the filing deadline (Dkt. No. 1 ¶ 1; Dkt. No. 1-1 at 5; Dkt. No. 1-3 at 28).

In their opposition to Defendants' motion, the plaintiffs do not dispute that the complaint does not allege any discriminatory acts or practices in violation of the FHA directed at any of the plaintiffs after September 10, 2021, nor do the plaintiffs allege that any of them filed an administrative complaint with HUD or a local public housing agency (Dkt. No. 15 at 6-11). Instead, they appear to argue that the time for them to file their complaint was tolled by the administrative procedure that preceded a separate case filed in April 2021 by the Department of Justice against the Chicopee Housing Authority and Monica Blazic in her capacity as Executive Director of the Chicopee Housing Authority, and that the continuing violation doctrine applied to their claims so long as the case brought by the Department of Justice remained open (Dkt. No. 15 at 6-11). *See United States of Am. v. Chicopee Hous. Auth.*, No. 3:21-cv-10649-KAR (D. Mass. filed Apr. 19, 2021) ("DOJ Case"). The plaintiffs are wrong.

Insofar as pertinent, the amended complaint in the DOJ Case alleged that on April 16, 2019, plaintiff Clover King filed a fair housing complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging a discriminatory failure to accommodate her disabilities. The administrative complaint was transferred to HUD, which investigated King's complaint and found that the defendants did not reasonably accommodate individuals with disabilities. HUD terminated its administrative proceeding concerning King's complaint on March 19, 2021, when King elected to pursue her claims in court. *See* Amended Complaint, DOJ Case, ECF 19, ¶¶ 26, 30-34. The plaintiffs have not pointed to any authority for their argument that an administrative proceeding that preceded the April 2019 filing of one civil action in federal court could serve to toll the statute of limitations for a separate civil action filed by different plaintiffs in state court in August 2023. To the extent the plaintiffs claim that the DOJ Case itself served to toll the statute of limitations for them to file a complaint, a case pending in

federal court is not, in the words of the tolling statute, "an administrative proceeding." 42 U.S.C.

§ 3613(a)(1)(B). The court is aware of no case that stands for either of these novel propositions.

Generally, cases reflect that the FHA tolling provision has been applied when the same plaintiff

who filed a federal complaint alleging discriminatory housing practices also filed an

administrative complaint with HUD alleging discriminatory housing practices. *See, e.g., Lath v.*

*Oak Brook Condo. Owner's Assoc.*, Civil No. 16-cv-463-LM, 2017 WL 34444774, at *3 (D.N.H.

Aug. 8, 2017); *Sentelle v. RPM Mgmt. Co., Inc.*, 653 F. Supp. 2d 917, 922 (E.D. Ark. 2009).

None of the plaintiffs in this action was a plaintiff in the DOJ Case. Ms. King is not a plaintiff in

the instant action. Further, her administrative charge alleged that the CHA failed to

accommodate her disabilities. So far as appears from the amended complaint in the DOJ Case,

Ms. King's complaint made no allegation of racial or ethnic discrimination, and the resulting

HUD investigative findings addressed CHA's failure to accommodate residents' disabilities, not

racial or ethnic discrimination in housing practices. The plaintiffs have not shown that the

tolling provision in 42 U.S.C. § 3613(a)(1)(B) has any application to their FHA claims.

　　　Their reliance on the continuing violation doctrine is similarly unavailing. "[W]here a

plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative

of the Act, but an unlawful practice that continues into the limitations period, the complaint is

timely when it is filed within [two years] of the last asserted occurrence of that practice. *Havens*

*Realty Corp.,* 455 U.S. at 380-81 (footnote omitted). The plaintiffs argue that because the

amended complaint in the DOJ Case included general (and some specific) allegations of

harassment based on race, *see* Amended Complaint, DOJ Case, ECF 19, ¶¶ 8-13, and the

complaint in the instant action relies on the allegations of racial harassment advanced by the

DOJ, *see* Compl. ¶¶ 23 & n.3, 24, 66 & n.12, the continuing violation doctrine applies.

Although the First Circuit has not addressed the issue, other courts have held that the FHA may give rise to a claim of a hostile housing environment cause of action.

> The Seventh Circuit, borrowing the analytical framework applied to Title VII hostile work environment claims, has held: "A hostile-housing-environment claim requires a plaintiff to show that: (1) she endured unwelcome harassment based on a protected characteristic; (2) the harassment was severe or pervasive enough to interfere with the terms, conditions, or privileges of her residency, or in the provision of services or facilities; and (3) that there is a basis for imputing liability to the defendant."

*Kapinga v. Terrace Pond, LLC*, No. 2:22-cv-00322-JAW, 2023 WL 4847267, at *3 (D. Me. July 27, 2023) (quoting *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 861-62 (7th Cir. 2018)); *see also Mohamed v. McLaurin*, 390 F. Supp. 3d 520, 546-47 (D. Vt. 2019) (predicting that the Second Circuit would recognize a post-acquisition hostile housing environment claim under 42 U.S.C. §3604 or § 3617). "[C]ourts that recognize a hostile housing environment claim under the FHA require a high degree of proof, effectively requiring a plaintiff to prove that the discriminatory conduct resulted in constructive eviction." *Mohamed*, 390 F. Supp. 3d at 548 (citing *Bloch v. Frichholz*, 587 F.3d 771, 777 (7th Cir. 2009)).

The continuing violation doctrine "does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' but only to discriminatory conduct that takes place 'over a series of days or perhaps years.'" *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). "The classic example of a continuing violation is a hostile [housing] environment, which 'is composed of a series of separate acts that collectively constitute one "unlawful . . . practice."'" *Id.* (quoting *Morgan*, 536 U.S. at 117). A plaintiff asserting a hostile environment claim and seeking to invoke the continuing violation doctrine must show that "'all acts which constitute the claim are part of the unlawful [discriminatory] practice and at least one act falls within the time period.'"

*Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 102 (1st Cir. 2024) (quoting *Morgan*, 536 U.S. at 122).

"'[I]n order to invoke [the continuing violations] doctrine, a claimant must show at a bare

minimum a series of discriminatory acts that emanate from *the same discriminatory* animus.'"

*Id.* at 104 (alterations in original) (quoting *Noviello v. City of Boston*, 389 F.3d 76, 87 (1st Cir.

2005), *abrogated on other grounds by Stratton v. Bentley Univ.,* 113 F.4th 25 (1st Cir. 2024)).

Here, none of the plaintiffs has made any such showing.  Aside from the allegedly

discriminatory failure to protect tenants from Urimagua-Guraboa's violence, which occurred

outside of the two-year limitation period, the complaint does not allege that *any* of the plaintiffs

identified in the complaint was the target of any harassment or discrimination by Defendants

within the two years preceding the filing of the complaint now before the court.  Indeed, the

complaint does not allege that any of the plaintiffs identified therein was *ever* personally

subjected to threatening, intimidating, or otherwise offensive discriminatory behavior that

unreasonably interfered with their use and enjoyment of the premises at any time.  The plaintiffs

apparently claim that the fact of the DOJ Case entitles them to invoke the continuing violation

doctrine because the amended complaint in the DOJ Case alleged discriminatory statements

directed at specific tenants or made generally about the ethnicity of CHA's tenants (Dkt. No. 15

at 7-8; DOJ Case, Amended Compl. ¶¶ 8-12, ECF 19).  Here again, the plaintiffs have failed to

point to any authority that would permit the plaintiffs in this case to rely on unproven and

untimely or undated allegations in a complaint filed in a separate action, by different plaintiffs, in

opposing a motion to dismiss on statute of limitations grounds.  The court is aware of no such

authority.  Even if the plaintiffs could rely on the amended complaint in the DOJ Case, which

they cannot, that pleading would not cure the failure to include timely allegations of a hostile

housing environment directed at the plaintiffs in the pending action.

It is apparent from the face of the complaint that the plaintiffs' FHA claim in Count I is barred by the FHA's two-year statute of limitations. The court will dismiss the FHA claims of all of the plaintiffs, including the Arochos' FHA claims, for this reason.

        3.      Count II:  Violation of 42 U.S.C. § 1983

"A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008) (citing *Rodríguez–Cirilo v. García,* 115 F.3d 50, 52 (1st Cir. 1997)).  There is no dispute that Defendants acted under color of state law.  Defendants argue that the complaint does not sufficiently allege violations of the plaintiffs' constitutional rights to due process and equal protection (Compl. ¶¶ 56-63).

        a.      The capacity in which Blazic is sued

The complaint fails to specify whether the plaintiffs have sued Blazic in an official or personal capacity.  The complaint, however, identifies Blazic as Executive Director of the CHA, responsible for overseeing all aspects of the CHA's operations.  The complaint focuses on Blazic's failure to perform her official duties and therefore asserts claims against her in her official capacity (Compl. ¶ 9).  "'A suit against a public official in his official capacity is a suit against the government entity' of which the official is an agent."  *Stuart v. City of Gloucester*, Civil Action No. 18-cv-11877-ADB, 2019 WL 3082830, at *13 (D. Mass. July 15, 2019) (quoting *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 61 (1st Cir. 2015)).  "[Municipal] officials, [such as Blazic,] are not 'persons' within the meaning of Section 1983 when acting in their official capacities and are, therefore, not subject to suit in federal court without the Commonwealth's consent.  Accordingly, a suit brought against [a municipal

employee] in his or her official capacity is a suit against the municipality itself." *Id.* (citing *Tyler v. Mass.*, 981 F. Supp. 2d 92, 95 (D. Mass. 2013); *Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 158 (D. Mass. 2007)).  Here, where the plaintiffs have brought suit against the CHA and against Blazic in her official capacity,[3] the official capacity claims against Blazic are properly dismissed as duplicative.  *Id.; see also Cordero*, 368 F. Supp. 3d at 150 (citing *Burrell v. Hampshire Cty.*, 307 F.3d 1, 7 (1st Cir. 2002)).

When, as in this case, a complaint does not specify the capacity in which a Section 1983 plaintiff is sued, "the First Circuit has adopted the 'course of proceedings' test to determine 'the nature of the liability sought to be imposed.'"  *Ritrovato v. Donovan*, Case No. 23-cv-10820-DJC, 2025 WL 777216, at *2 n.1 (D. Mass. Mar. 11, 2025) (quoting *Powell v. Alexander*, 391 F.3d 1, 22 (1st Cir. 2004)).  "Factors relevant to this analysis include the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity."  *Powell,* 391 F.3d at 22 (citing *Moore v. City of Harriman*, 272 F.3d 769, 772 n.1 (6th Cir. 2001)).  The complaint does not seek punitive damages, and the plaintiffs have stated their allegations against Defendants collectively.  Defendants' motion to dismiss does not raise a qualified immunity defense.  These factors suggest that the plaintiffs have sued Blazic exclusively in her official capacity.  It is very early in these proceedings, however, and the court is not prepared to foreclose the possibility, particularly given the nature of some of the allegations about Blazic's conduct, that the course of proceedings would show the plaintiffs' intention to assert claims against Blazic in a personal

---

[3] The CHA is an agency of the City of Chicopee.  Accordingly, the city rather than CHA is the suable entity.  *See, e.g., Cordero v. Pack*, 368 F. Supp. 3d 137, 149 (D. Mass. 2019) (citing *Dwan v City of Boston*, 329 F.3d 275 n.1 (1st Cir. 2003)).

capacity.  The court therefore assumes, for purposes of ruling on Defendants' motion to dismiss, that the plaintiffs intend to state claims against Blazic personally.

> b.    The Substantive Due Process Claims

The plaintiffs allege that Defendants "violated [their] substantive due process rights under the 14th Amendment by allowing a known violent individual . . . to remain in CHA housing, thereby depriving Plaintiffs of their right to personal security and bodily integrity," (Compl. ¶ 58), and that these "actions also constituted deliberate indifference to [their] safety . . . as they were aware of the danger posed by [Urimagua-Guraboa], or reasonably should have been, yet took no meaningful action to protect Plaintiffs, thereby creating or exacerbating the risk of harm or creating the conditions which gave rise to what occurred on September 10, 2021" (Compl. ¶ 60).

"The [Due Process] Clause is phrased as a limitation on the State's power to act, not a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  To assert a substantive due process claim, a plaintiff must allege that (1) she was deprived of an established life, liberty, or property interest, (2) the deprivation of the protected right was caused by government conduct, and (3) the governmental action shocks the conscience. *See Rivera v. Rhode Island,* 402 F.3d 27, 33-35 (1st Cir. 2005). The plaintiffs have alleged constitutionally protected interests in bodily integrity on the part of Laracuente and a protected interest in life on the part of the Arochos as representatives of their father. *See id.* at 34.

The complaint fails, however, as to the second element.  It is well-settled that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.  The plaintiffs' substantive due process

claims are based on such a private act of violence committed by Urimagua-Guraboa.  Based on

the principle set forth in *DeShaney*, numerous federal courts have held that public housing

authorities are not constitutionally required to provide safe housing for residents and guests, and

that an alleged failure to do so does not give rise to a substantive due process claim.  *See, e.g.,*

*Bullard v. Inkster Hous. & Redevelopment Comm'n*, 126 F. App'x. 718, 719-21 (6th Cir. 2005)

(unpublished) (holding that the allegations that the defendant failed to keep records of master

keys or a policy for their control, permitted unauthorized residents to live in public housing,

failed to conduct criminal background checks on residents, and failed to correct, address, or

repair security violations or risks did not support a substantive due process claim); *Dawson v.*

*Milwaukee Hous. Auth.*, 930 F.2d 1283, 1284 (7th Cir. 1991) (holding that, assuming the housing

authority played some causal role in failing to protect the plaintiff from a fellow public housing

resident who shot him, the plaintiff failed to state a substantive due process claim; the housing

authority did not owe the plaintiff safe housing as a matter of constitutional law); *Cook v. Hous.*

*Auth. of Baltimore City,* CIVIL NO. JKB-20-1877, 2020 WL 7055477, at *2-3 (D. Md. Dec. 2,

2020) (granting the defendants' motion to dismiss the plaintiff's substantive due process claim

when a housing authority and its employees knowingly failed to protect the plaintiff from

violence); *Henderson v. NYCHA,* 19-CV-7249 (AMD), 2020 WL 902795, at *2 (E.D.N.Y. Feb.

25, 2020) ("[T]he Fourteenth Amendment does not require public housing authorities to provide

safe conditions for residents and guests, much less obligate them to control the malicious

conduct of third parties."); *Hooper v. United States Dept. of Hous. & Urban Dev.*, Civ. No. 6:17-

cv-00031-MC, 2017 WL 2380176, at *2-3 (D. Ore. May 31, 2017) (granting a motion to dismiss

the plaintiff tenant's substantive due process claim because the plaintiff was injured by his

neighbors and the housing authority's failure to protect him did not support a substantive due

process claim); *Arceneaux v. Marin Hous. Auth.*, Case No. 15-cv-00080-MEJ, 2015 WL 3396673, at *5-6 (May 26, 2015) (granting a motion to dismiss the complaint where plaintiff's allegations showed at most that the defendant left the plaintiff public housing resident in a living situation where her family was not safe from third parties); *Hurt v. Philadelphia Hous. Auth.,* 806 F. Supp. 515, 523 (E.D. Pa. 1992) (rejecting plaintiffs' § 1983 claim that they had a constitutional right to "'decent, safe, and sanitary housing'").

The state-created danger exception to the general rule, under which state actors "may be held liable for failing to protect plaintiffs from danger created or enhanced by their affirmative acts," *Irish v. Fowler,* 979 F.3d 65, 67 (1st Cir. 2020), does not apply because the plaintiffs have not alleged an "'affirmative[] act[ that] increase[ed] the threat to an individual of third-party private harm.'" *Id.* at 74 (quoting *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004)). "'[F]ailure to act is not an affirmative act under the state-created danger theory.'" *Wilson v. Gregory*, 3 F.4th 844, 858 (6th Cir. 2021) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). Further, "rendering a person more vulnerable to risk does not create a constitutional duty to protect." *Rivera*, 402 F.3d at 37.

The closest the plaintiffs come to alleging an affirmative act by Defendants is that at some point in time prior to October 11, 2019, they moved Urimagua-Guraboa into the housing unit next door to Laracuente (Compl. ¶ 36). This is, at most, an allegation that Defendants rendered Laracuente and Arocho, as her visitor, more vulnerable to risk. The plaintiffs have not alleged that Blazic or anyone else affiliated with CHA had any communications with Urimagua-Guraboa that gave rise to or exacerbated the hostility between him and Laracuente or Arocho or otherwise provoked or participated in any confrontation between Laracuente and Urimagua-Guraboa or Arocho and Urimagua-Guraboa. *Compare Irish,* 979 F.3d at 67-68, 79-80 (finding a

state-created danger where the defendant officers told the plaintiff's abuser about her accusation

of rape, thereby triggering his violent acts, which included murder, assault, kidnapping, and

rape). The plaintiffs' allegations that Defendants failed to evict Urimagua-Guraboa or otherwise

enforce CHA's Policies aimed at providing a safe housing environment are allegations of

omissions that do not meet the requirements for establishing a substantive due process claim.

*See id.* at 75; *Bullard* 126 F. App'x at 719-20; *Dawson*, 930 F.2d at 1283-85; *Arcenaux.,* 2015

WL 3396673, at *1, *5-6. Because the complaint fails to allege actionable affirmative acts, the

court need not, and does not, reach the questions of whether the plaintiffs have sufficiently

alleged deliberate indifference that shocks the conscience. *See Rivera*, 402 F.3d at 38; *Cohen ex*

*rel. Estate of Cohen v. City of Portland*, 703 F. Supp. 3d 269, 284 (D. Me. 2023). In any event,

the cases upon which the plaintiffs rely to argue that Defendants were deliberately indifferent to

the plaintiffs' due process rights, *Washington v. Hous. Auth. of Columbia,* 58 F.4th 170, 179-82

(4th Cir. 2023); and *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 559-61 (1st Cir.

1988), are distinguishable because the defendants, rather than third parties, harmed the plaintiffs

in those cases (Dkt. No. 15 at 13-15).

"[A]lthough a [government agency] may not be held liable under a theory of *respondeat*

*superior* for an employee's constitutional violation, it may be held liable when 'execution of [the

agency's] policy or custom . . . inflicts the injury' and is the 'moving force' behind the

employee's constitutional violation." *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016) (fourth

alteration in original) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). This

principle has no application to the plaintiffs' complaint because (1) a municipality "cannot be

liable for the actions of its officials . . . if those actions 'inflicted no constitutional harm,'"

*Robinson v. Cook*, 706 F.3d 25, 38 (1st Cir. 2013) (quoting *City of Los Angeles v. Heller*, 475

U.S. 796, 799 (1986)), and no constitutional harm is alleged here, and (2) the complaint alleges at some length that CHA had appropriate policies in place to protect its tenants with which Blazic failed to comply. *See Abdisamad v. City of Lewiston*, 960 F.3d 56, 61 (1st Cir. 2020) (holding that when a complaint asserts that injuries were caused by failure to comply with a municipality's policies, liability will not lie).

Defendants are entitled to dismissal of the plaintiffs' substantive due process claims.

        c.      The Equal Protection Claims

The plaintiffs allege that Defendants violated their rights under the Fourteenth Amendment's Equal Protection Clause "by engaging in discriminatory conduct that subjected non-white tenants, including the plaintiffs, to greater risks and dangers, demonstrating deliberate indifference to their rights and safety" (Compl. ¶ 59). For their part, Defendants argue that the plaintiffs fail adequately to allege that, by allowing Urimagua-Guraboa to continue residing in CHA housing, Defendants treated the plaintiffs differently because of their race or ethnicity as compared to other tenants (Dkt. No. 8 at 11-12).

"The Equal Protection Clause requires that 'all persons similarly situated . . . be treated alike.'" *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 10 (1st Cir. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). "'To prevail on a claim of racial discrimination in violation of the Equal Protection Clause, a plaintiff must establish (1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection for adverse treatment was based on his race.'" *Cumby v. Am. Med. Response, Inc.*, Civil Action No. 18-30050-MGM, 2019 WL 9244983, at *6 (D. Mass. Oct. 31, 2019) (quoting *Ríos-Colón v. Toledo-Dávila*, 641 F.3d 1, 4 (1st Cir. 2011)). "At the motion to dismiss stage, 'in order to "provide fair notice to the defendants and state . . . facially plausible legal claim[s],"' a

plaintiff must 'identify his putative comparators.'" *Id.* (quoting *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011)).

The plaintiffs have not stated the elements of a plausible equal protection claim. They allege that Blazic's derogatory comments directed at some Hispanic tenants indicated her preference for white tenants and that Hispanic tenants were subjected to "greater risks and dangers" than white tenants (Compl. ¶¶ 23-25, 59). These are conclusory assertions, which are insufficient to state a claim. *See Santos v. Fed. Emergency Mgmt. Agency*, 327 F. Supp. 3d 328, 341 (D. Mass. 2018). The plaintiffs have not identified any similarly situated CHA tenants who were not Hispanic for whom Defendants provided protection from dangerous neighbors or who were otherwise treated differently than the plaintiffs, nor do the facts alleged in the complaint give rise to a reasonable inference that such individuals exist. *See Alston v. Spiegel*, 988 F.3d 564, 575 (1st Cir. 2021) (affirming dismissal of equal protection claim on the ground that the complaint failed to identify anyone who was similarly situated to the plaintiff but was treated differently); *Cumby*, 2019 WL 9244983, at *6; *Santos,* 327 F. Supp. 3d at 341.

To the extent the plaintiffs seek to show a policy or practice on CHA's part, "[a] single incident of a constitutional violation is insufficient to prove a custom or policy even when the incident involves several employees of the municipality." *Craig v. Floyd Cty.*, 643 F.3d 1306, 1311 (11th Cir. 2011). In their opposition to Defendants' motion to dismiss, the plaintiffs disavow knowledge of any "similarly situated individuals at CHA's nine other housing complexes who experienced what they did on September 10, 2021, or before. This includes CHA's three complexes for low-income elderly and handicapped individuals and six general complexes for low-income residents. Plaintiffs also know of no private renters in Chicopee who had a murderer placed next door who later committed a murder" (Dkt. No. 15 at 14 n.37). Thus,

they allege no more than a single instance of a constitutional violation, which, even if proven,

would be insufficient to show a custom or policy giving rise to municipal liability.

Where the plaintiffs have failed to plead a facially plausible equal protection violation, so

much of Count II as asserts that claim will be dismissed.

4.      Count III:  Civil Rights Conspiracy under 42 U.S.C. § 1985(3)

The plaintiffs alleged that Blazic and "unidentified individuals who were officers,

administrators, servants and/or employees" of the CHA "conspired to deprive Plaintiffs, who are

non-white tenants, of their constitutional rights [to personal security, bodily integrity, and equal

protection under the law] by engaging in a pattern or practice of discriminatory conduct"

including allowing "a known violent individual with a criminal history to continue residing in

CHA housing despite his repeated threats and violent behavior" (Compl. ¶¶ 11, 66, 67).  The

plaintiffs further allege that Defendants "took overt actions in furtherance of the conspiracy,

including ignoring or dismissing complaints from Plaintiffs and other tenants about [Urimagua-

Guraboa's] conduct, and failing to enforce the CHA's policies in a manner that would have

protected the Plaintiffs" (Compl. ¶ 68).

"'A civil rights conspiracy as commonly defined "is a combination of two or more

persons acting in concert to commit an unlawful act . . . the principal element of which is an

agreement between the parties to inflict a wrong against or injury upon another."'"  *Parker v.

Landry*, 935 F.3d 9, 17 (1st Cir. 2019) (alteration in original) (quoting *Estate of Bennett v.

Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008)).  Accordingly, a claim for conspiracy under 42

U.S.C. § 1985(3) must include factual allegations establishing four elements:

> (1) two or more persons must conspire, (2) to deprive, either directly or indirectly,
> any person or class of persons of the equal protection of the laws or of equal
> privileges and immunities under the laws, (3) one or more of the conspirators
> must have done or caused to be done an act in furtherance of the object of the

conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy.

*Andrade v. Jamestown Hous. Auth.,* 82 F.3d 1179, 1192 (1st Cir. 1996). "Pleading a section 1985(3) conspiracy claim 'requires at least minimum factual support of the existence of a conspiracy.'" *Parker*, 935 F. 3d at 18 (quoting *Francis-Sobel v. Univ. of Me.*, 597 F.2d 15, 17 (1st Cir. 1979)).

The complaint fails to provide the requisite minimum factual support for the existence of a conspiracy.  The plaintiffs rely on the unproven allegations in the DOJ Case to support their contention of animus on Blazic's part.  The complaint does not allege that any of the plaintiffs was personally the target of racial or ethnic harassment by Blazic.  The complaint does not include any factual allegations that could give rise to an inference that any specific employee or agent of the CHA other than Blazic harbored animus against CHA residents or visitors based on race or ethnicity.  The plaintiffs have not identified Blazic's alleged co-conspirator(s), nor have they alleged facts, as opposed to conclusory accusations, from which it could be inferred that a group of unidentified individuals affiliated with CHA agreed with each other to engage in an overt act or acts aimed at depriving the plaintiffs of safe housing, or otherwise discriminating against them, because of ethnicity.  The plaintiffs have not satisfied the First Circuit's standard as set out in *Parker*.  Accordingly, Count III will be dismissed for failure to state a claim.

B.     State Law Claims

Defendants removed the case to this court (Dkt. No. 1).  The state law claims are in federal court solely as a result of the exercise of supplemental jurisdiction.  *See* 42 U.S.C. § 1367(a).  The court is dismissing all of the federal claims stated in the complaint.  The First Circuit has held that in these circumstances "it is an abuse of discretion for a district court to

retain jurisdiction over the remaining state law claims . . . ." *Wilbur v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017). For this reason, the state law claims in this action will be remanded to the court from which they were removed.

    IV.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 7) is GRANTED with prejudice as to Counts I, II, and III. The motion is denied without prejudice as to Counts IV through XVII, which will be remanded to Superior Court Department of the Massachusetts Trial Court, Hampden County.

It is so ordered.

Dated: June 27, 2025                    <u>Katherine A. Robertson</u>
                                                KATHERINE A. ROBERTSON
                                                U.S. MAGISTRATE JUDGE